## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

THE ESTATE OF ALIZON LOPEZ,
by and through putative personal representative SHAWN LUCIUS, and A.L. and Z.L., minor
children, by and through next friend SHAWN LUCIUS,

  Plaintiffs,

v.

NAPHCARE INC.
BOARD OF COUNTY COMMISSIONERS OF COUNTY OF MESA, COLORADO,
ADAMS COUNTY SHERIFF TODD ROWELL, in his official capacity,
CRAIG BOWEN,
ART SMITH,
LISA PECK,
CATHY TATE,
DENISE PEMBERTON,
WHITNEY HUCKINS,
AMANDA SIMON,
COURTNEY CROSS,
LIZABETH SANDOVAL,
JOHANNAH ROBERTS,
DANIEL KELL,
JEFFREY ALVAREZ,
SCOTT MORAN,
CASEY GLADNEY,
ELLIOT WADE,
KASSI MCDONALD,
HEATHER STANFORD,
JESSICA GARDNER,
NEIL SANCHEZ,
KAREN POOLEY,
MEGAN MARAH,
JESSICA BUSHERI,
JENNA RAYMOND,
ROBERT EMERY,
KIMBERLY SANCHEZ,
JULIE MAMO,
MICHELE WILKIE,

CARRIE SHAHBAHRAMI,
DEMETRIA TAN TORRES,
SHANNON LOVERN,
ANDREW HIGGINBOTHAM, individually,

     Defendants.

_____

## COMPLAINT AND JURY DEMAND

_____

Plaintiff the Estate of Alizon Lopez, by and through its putative personal representative Shawn Lucius, and Plaintiffs A.L. and Z.L., individually and through next friend Shawn Lucius, through counsel of the law firm MAXTED LAW LLC, submit the following Complaint and Jury Demand:

## I.  INTRODUCTION

1.     Alizon Lopez died a tragic and preventable death by fentanyl overdose on May 21, 2022, while in custody of the Mesa County jail, due to Defendants denial of treatment for her opiate use disorder and their failure to protect her from the deadly risk of fentanyl spreading throughout the jail.

2.     A beloved young mother of four, Ms. Lopez had struggled with chronic opiate use disorder (OUD), including fentanyl, for years. To treat this disease, she had been prescribed Medication Assisted Treatment (MAT), specifically Methadone. When she entered Mesa jail in January of 2022, Ms. Lopez saw it as an opportunity to reengage with MAT medication. Ms. Lopez specifically requested medication and MAT on numerous occasions. She wanted to receive treatment, stay clean, work, maybe go to college, and be a better mother to her kids; but she needed help to get there, and the first critical step was MAT on a continuing basis, which

2

standards of care had long dictated was critical to treat OUD and prevent overdose deaths.

3.      Ms. Lopez had a right to MAT treatment while in the jail, and she had a right to be protected from deadly fentanyl in the jail.

4.      Despite this, Mesa County and its medical contractor, NaphCare, systematically failed to provide MAT despite her repeated requests for treatment. Left untreated, these Defendants knew a severe OUD patient like Ms. Lopez would relapse to using, facing a substantial risk of overdose and death.

5.      Meanwhile, jail staff failed to protect Ms. Lopez from fentanyl entering the jail and being spread into her unit, where it would predictably kill her. In the leadup to her death, a group of known Fentanyl Traffickers smuggled a huge number of counterfeit "M30" fentanyl-laced pills into the jail. Despite knowing these Traffickers were attempting to smuggle pills into the jail, jail security failed to isolate them from others, failed to adequately search for the deadly pills, ignored body scans showing one of the women traffickers had contraband—hundreds of fentanyl pills—inside her body, and callously ignored the substantial risk of fentanyl entering the jail and causing harm or death.

6.      On May 20, the day before Ms. Lopez died, jail staff even received a tip that fentanyl was in the women's unit and "someone was going to end up dead" unless the jail acted urgently.

7.      Jail staff failed to act urgently, despite knowing every moment counted to save lives. They failed to investigate the information, failed to lockdown the units, failed to inform women in the jail of the risks of fentanyl present, and failed to take any other urgent action to protect Ms. Lopez from fatal overdose. On May 20, one or more crushed pills had been passed to

Ms. Lopez in a slip of paper. Her OUD untreated and jail staff indifferent to the dangers she faced, Ms. Lopez consumed the powder on May 21, and died of fentanyl intoxication, where jail staff also failed to adequately monitor her safety.

8.      Had Defendants performed their duties to treat's Ms. Lopez condition, and to and protect her from deadly fentanyl in the jail, she would not have died or suffered the damages endured due to Defendants' conduct. Defendants violated Ms. Lopez's state and federal rights and are liable for the damages caused.

## II. JURISDICTION AND VENUE

9.      This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution, 42 U.S.C. § 1983 and § 1988, and under Colorado state law.

10.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

11.      Personal jurisdiction over each of the defendants is conferred under Federal Rule of Civil Procedure 4(d)(1).

12.      Supplemental jurisdiction over state claims is conferred by 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and meritorious and the state causes of action arise from a common nucleus of operative facts.

13.      Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391, as the district where all relevant events and omissions occurred.

## III. PARTIES

14.      Plaintiff the Estate of Alizon Lopez ("Estate") is a party in interest following the

4

death of Alizon Lopez a Colorado resident. The Estate appears through its putative personal representative Shawn Lucius, pending a petition for appointment by the probate court.

15.     Plaintiffs A.L. and Z.L. are minor children of Alizon Lopez and citizens of the United States, and they appear by and through next friend and guardian Shawn Lucius.

16.     Defendant NaphCare Inc. ("NaphCare") is an Alabama company with its principal address located at 2090 Columbiana Rd, Suite 4000, Vestavia Hills, Alabama, and its registered agent in Colorado is Corporation Service Company, located at 1900 W Littleton Boulevard, Littleton, Colorado, 80120.

17.     At all times relevant to the subject matter of this litigation, NaphCare contracted with Mesa County to provide medical, mental health, and substance abuse services to people incarcerated at MCDF. At all relevant times, NaphCare was responsible for the oversight, supervision, and training of all of its staff at MCDF, including the Individual NaphCare Defendants in this matter, and for the medical care of people in their care at MCDF.

18.     At all relevant times, NaphCare was acting under color of state law and performing a central function of the state.

19.     Defendant NaphCare is a private corporation, and thus neither it nor any of its employees or contractors are entitled to any immunity under the Colorado Governmental Immunity Act on Colorado state law claims or qualified or any other immunity on the federal law claims.

20.     Defendant the Board of County Commissioners of Mesa County, Colorado, ("Board" or "County" or "Mesa") is a governmental entity under the laws of Colorado, is a policy-maker and final decision-maker for the County, it funds and oversees the Mesa County

5

Sheriff's Office (MCSO) including operation of the Mesa County Detention Facility (MCDF or "jail"), and with the Sheriff is responsible for the policies, procedures, customs, practices, supervision, and training (collectively referred to herein as "policies") of the MCSO and the jail. Mesa County and the Sheriff are also responsible for contracting for services with providers operating in the jail, including NaphCare as alleged herein. Mesa County is a proper defendant to this action pursuant to C.R.S. § 30-11-105.

21.     Defendant Todd Rowell is the Sheriff of Mesa County acting under color of state law who is a policy-maker and final decision-maker for the MCSO, MCDF, and the County. He is sued in his official capacity.

22.     The Sheriff and the Board ("Mesa County", "Mesa County Defendants", "County", "County Defendants") are responsible for the jail located at 215 Rice Street Grand Junction, Colorado 81501. The County had a non-delegable duty to ensure the jail provides constitutional care to persons incarcerated there, including Ms. Lopez.

12.     Defendant Sergeant Craig Bowen was at all times relevant a sergeant and employee of the MCSO acting in his official capacity as a peace officer under color of law. He is sued in his individual capacity.

13.     Defendant Captain Art Smith was at all times relevant an employee of the MCSO acting in his official capacity as a peace officer under color of law. He is sued in his individual capacity.

14.     Defendant Lieutenant Lisa Peck was at all times relevant an employee of the MCSO acting in her official capacity as a peace officer under color of law. She is sued in her individual capacity.

6

15.     Defendant Sergeant Cathy Tate was at all times relevant a sergeant and employee of the MCSO acting in her official capacity as a peace officer under color of law. She is sued in her individual capacity.

16.     Defendant Denise Pemberton was at all times relevant a deputy and employee of MCSO acting in her official capacity as a peace officer under the color of law. She is sued in her individual capacity.

17.     Defendant Whitney Huckins was at all times relevant a deputy and employee of MCSO acting in her official capacity as a peace officer under the color of law. She is sued in her individual capacity.

18.     Defendant Amanda Simon was at all times relevant a deputy and employee of MCSO acting in her official capacity as a peace officer under the color of law. She is sued in her individual capacity.

19.     Defendant Courtney Cross was at all times relevant a deputy and employee of MCSO acting in her official capacity as a peace officer under the color of law. She is sued in her individual capacity.

20.     Defendant Lizabeth Sandoval was at all times relevant a deputy and employee of MCSO acting in her official capacity as a peace officer under the color of law. She is sued in her individual capacity.

21.     Defendant Johannah Roberts was at all times relevant a deputy and employee of MCSO acting in her official capacity as a peace officer under the color of law. She is sued in her individual capacity.

22. Defendant Daniel Kell was at all times relevant a deputy and employee of MCSO acting in his official capacity as a peace officer under the color of law. He is sued in her individual capacity.

23. Defendant Jeffrey Alvarez was at all times relevant acting under color of state law as an employee of NaphCare and a citizen of the United States. He is sued in his individual capacity.

24. Defendant Scott Moran was at all times relevant acting under color of state law as an employee of NaphCare and a citizen of the United States. He is sued in his individual capacity.

25. Defendant Casey Gladney was at all times relevant acting under color of state law as an employee of NaphCare and a citizen of the United States. She is sued in her individual capacity.

26. Defendant Elliot Wade was at all times relevant acting under color of state law as an employee of NaphCare and a citizen of the United States. He is sued in his individual capacity.

27. Defendant Kassi McDonald was at all times relevant acting under color of state law as an employee of NaphCare and a resident of Colorado. She is sued in her individual capacity.

28. Defendant Heather Stanford was at all times relevant acting under color of state law as an employee of NaphCare and a resident of Colorado. She is sued in her individual capacity.

29.     Defendant Jessica Gardner was at all times relevant acting under color of state law as an employee of NaphCare and a resident of Colorado. She is sued in her individual capacity.

30.     Defendant Neil Sanchez was at all times relevant acting under color of state law as an employee of NaphCare and a resident of Colorado. He is sued in his individual capacity.

31.     Defendant Karen Pooley was at all times relevant acting under color of state law as an employee of NaphCare and a resident of Colorado. She is sued in her individual capacity.

32.     Defendant Megan Marah was at all times relevant acting under color of state law as an employee of NaphCare and a resident of Colorado. She is sued in her individual capacity.

33.     Defendant Jessica Busheri was at all times relevant acting under color of state law as an employee of NaphCare and a resident of Colorado. She is sued in her individual capacity.

34.     Defendant Jenna Raymond was at all times relevant acting under color of state law as an employee of NaphCare and a resident of Colorado. She is sued in her individual capacity.

35.     Defendant Robert Emery was at all times relevant acting under color of state law as an employee of NaphCare and a resident of Colorado. He is sued in his individual capacity.

36.     Defendant Kimberly Sanchez was at all times relevant acting under color of state law as an employee of NaphCare and a resident of Colorado. She is sued in her individual capacity.

37.     Defendant Julie Mamo was at all times relevant acting under color of state law as an employee of NaphCare and a resident of Colorado. She is sued in her individual capacity.

38.     Defendant Michele Wilkie was at all times relevant acting under color of state law as an employee of NaphCare and a resident of Colorado. She is sued in her individual capacity.

39.     Defendant Carrie Shahbahrami was at all times relevant acting under color of state law as an employee of NaphCare and a resident of Colorado. She is sued in her individual capacity.

40.     Defendant Shannon Lovern was at all times relevant acting under color of state law as an employee of NaphCare and a resident of Colorado. She is sued in her individual capacity.

41.     Defendant Andrew Higginbotham was at all times relevant acting under color of state law as an employee of NaphCare and a resident of Colorado. He is sued in her individual capacity.

42.     Defendant Demetria Tan Torres was at all times relevant acting under color of state law as an employee of NaphCare and a resident of Colorado. She is sued in her individual capacity.

23.     "NaphCare Defendants" herein refers to all employees and agents of NaphCare and to NaphCare, and "Individual NaphCare Defendants" refers to individual employees and agents of NaphCare.

24.     "Individual County Defendants" herein refers to the individual employees and agents of Mesa County.

## IV.  FACTUAL ALLEGATIONS

### Alizon Lopez Was A Beloved Young Mother

25.     Alizon Lopez was 28 years old when she lost her life in the Mesa County jail. Ms.

Lopez was a mother of four children. At the time of her death, Ms. Lopez's children were aged 3, 7, 10, and her fourth child was just 5 months old. She was a beloved daughter, sister, and mother.



26.    Ms. Lopez began struggling with opioid use disorder, and other substance use, as a teenager. Her OUD increased to the point she used fentanyl daily. However, when properly treated with medication she achieved time periods of sobriety. Ms. Lopez was treated with

Methadone maintenance over the course of years with substantial success. Ms. Lopez had also maintained employment and worked toward a college degree.

27.     Unfortunately, prior to her death Ms. Lopez had relapsed. With her opiate use disorder untreated, Ms. Lopez returned to using fentanyl daily. She was arrested on drug-related charges on January 14, 2022, when she entered the custody of Defendants who became charged with her care.

### NaphCare Defendants Knew Ms. Lopez Was A Longtime Opiate Addict Prescribed Methadone Maintenance and Requiring Medication

28.     From the moment she entered their care and continuing to the time of her death, NaphCare Defendants knew from Ms. Lopez and her medical history that she had been prescribed medication for OUD, going back years, including Methadone maintenance, indicating her OUD was severe and chronic and necessitated long-term MAT.

29.     During a prior incarceration in Mesa County jail in 2020, Ms. Lopez reported to MCDF and medical staff that she had been prescribed Methadone maintenance to treat her severe OUD. Ms. Lopez reported she had taken Methadone daily for over a year in Florida, including during a period of incarceration, as well as at a clinic in Grand Junction.

30.     This information was documented in her medical chart at the jail and viewable by the NaphCare Defendants during her 2022 detention.

31.     On or about January 14, 2022, Ms. Lopez was arrested on charges related to drug possession and booked into the Mesa County jail. NaphCare Defendants asessed Ms. Lopez and recorded her medical and substance use history. Ms. Lopez again reported her longtime severe opiate use disorder, as well as alcohol use and other drug use. Defendants learned Ms. Lopez

used opiates and specifically fentanyl daily at that time, including as of the date of her arrest. Ms. Lopez also tested positive for fentanyl at booking.

32.     NaphCare Defendants involved in Ms. Lopez's treatment reviewed her medical chart and therefore knew she'd been treated with Methadone and that she required medication to treat withdrawal, and MAT maintenance on a continuing basis. They knew due to her OUD if untreated with MAT she would use opiates including fentanyl and face a grave and substantial risk of overdose and death in the jail and in the community.

**Opiate Use Disorder Is a Chronic, Deadly Disease Necessitating Medication**

33.     For years, it has been known to Defendants and all medical and jail professionals, as well as most laypersons aware of the decades-long opioid crisis in America, that opiate use disorder (OUD) is a chronic and deadly disease. OUD is often categorized as either mild, moderate, or severe. It is chronic, meaning lifelong.

34.     Ms. Lopez met the criteria for severe OUD and her condition was chronic.

35.     OUD is a disease in which a pattern of opioid misuse causes dependency and addiction, and causes negative health impacts including a high risk of overdose and death. OUD has serious and life-threatening consequences if untreated, including disability, relapse, and overdose and death.

36.     OUD is also a disability which interferes with basic life activities, particularly severe OUD as Ms. Lopez suffered. Ms. Lopez was disabled due to her OUD.

37.     OUD—particularly for a chronic and severe patient like Ms. Lopez—involves an overpowering, irresistible drive to use opioids despite the risks and consequences. It alters the body and brain chemistry and causes physiological and psychological dependence and addiction,

so powerful the patient is unable to stop the behavior (if not treated, as alleged herein).

38.     As a result, medication maintenance is critical to treat patients like Ms. Lopez suffering from opiate use disorder. This treatment, known as Medication for Opiate Use Disorder (MOUD), or Medically Assisted Treatment (MAT), involves prescribing medication, including Methadone and Buprenorphine, to treat opioid use disorder on an ongoing basis, often indefinitely.

39.     These medications function as opioid agonists, meaning they target receptors in the body like fentanyl and other opiates, but do not cause the same high. As opioid agonists, these medications can therefore stop or prevent withdrawal and reduce or eliminate cravings, preventing the patient from returning to opioid use.

40.     Because MAT necessitates continuous care to treat this chronic disease, it is often termed "maintenance," or opioid "replacement" therapy. Because chronic OUD patients will continue to use opiates like fentanyl if untreated, the purpose of MAT maintenance is to prescribe medication the patient will take daily to prevent returning to opiates.

41.     MAT is ongoing and treats the chronic, permanent disease of OUD. Detox protocols do not treat the chronic disease of OUD, and instead treat only the short-term symptoms of withdrawal. Prescribing detox, as occurred herein to Ms. Lopez, does not amount to MAT and failed to treat her severe OUD on a continuing basis.

42.     MAT had for over a decade prior to Ms. Lopez's death been known essential not only to treat the disease of OUD, but to prevent the deadly consequences of OUD, particularly fentanyl overdoses. The extreme risk of overdose has been known for years by providers and the general public. The United States suffered an opiate overdose crisis for over a decade, and from

14

2015-2021 saw the number of fentanyl overdose deaths skyrocket from around 5,000 per year to over 70,000 per year in 2021, the year prior to Ms. Lopez's death. It is estimated that 3 million people in America suffer from some form of OUD.

43.     Fentanyl has long been known to be particularly deadly in causing overdoses—a single pill laced with fentanyl can kill. Especially when a person has not been taking opiates recently, a single pill containing fentanyl can quickly cause the person to overdose, stop breathing, and die.

44.     Fentanyl and pills laced with fentanyl had become widespread and available throughout the country, including in Mesa County.

45.     Fentanyl is highly addictive even amongst opiates. Fentanyl is an extremely potent opiate, 100 times more potent than morphine and many times more potent even than heroin. It causes the user to feel extreme happiness and euphoria temporarily. Once physiological dependency exists, the patient requires frequent and increasing dosages of fentanyl to prevent severe withdrawal.

46.     Due to its potency, tiny amounts of fentanyl can kill—as little as a fraction of a milligram, contained in a single small pill. It can be taken orally, or crushed and snorted, or absorbed by the body in other ways.

47.     Also due to its potency, the addiction and dependency it causes in the patient suffering OUD is extremely powerful. Patients with OUD will return to using if not appropriately treated, which almost always necessitates MAT maintenance.

48.     Patients suffering severe OUD like Ms. Lopez, particularly those using fentanyl daily, will suffer severe withdrawal when they come down off of fentanyl and stop taking it.

Withdrawal from fentanyl causes extreme pain and suffering, nausea and vomiting, diarrhea, fever and sweating, tachycardia, insomnia, severe cravings, dehydration, and can be fatal if not treated properly.

49.     Without MAT, patients like Ms. Lopez will relapse to using fentanyl, if presented the opportunity, even if they have already withdrawn and have not been taking opiates for a period of time. While in such a state of being "opiate naïve," meaning not currently tolerant, the patient faces a high risk of overdose from fentanyl.

50.     NaphCare and County Defendants knew this information alleged herein, as do reasonably informed laypersons observing the opioid and fentanyl overdose death crisis in America. NaphCare and County Defendants knew providing MAT for patients like Ms. Lopez was critically important to protecting her health and life, and that denying MAT created a serious risk of overdose and death. When appropriately medicated through MAT, cravings to use opiates can be reduced and eliminated, enabling individuals to stop using unprescribed drugs like fentanyl. MAT maintenance therefore has many benefits, including most obviously preventing overdose by preventing fentanyl (or other opiate). MAT also enables the patient to be drug free and live a more productive and healthy life, rather than being captive to the addiction, and to allow them to accommodate the disability of OUD and carry out daily life activities.

**Colorado's MAT Program In Jails Rolls Out In 2017**

51.     Demonstrating how long MAT has been known to be essential to treat OUD including especially in jails, in 2017, the Colorado General Assembly enacted a program to provide MAT/MOUD treatment throughout the state as part of a program known as Jail Based Behavioral Services (JBBS), and passed laws that would eventually require all jails to provide

16

MAT under state law.

52.     The purpose of providing MAT in jails through JBBS is manifold, including to educate and provide MAT to people suffering from OUD to treat the disease continuously as maintenance. The purpose of MAT in jails is also to ensure continuity of care when people return to the community and their families, by linking patients up with clinics and other providers to ensure MAT can continue in the community.

53.     Many people suffering OUD enter the criminal system due to the harms it inflicts on their lives, including financial desperation and unlawful drug use, and other behavior leading to criminal charges.

54.     Thus, jails are a key location—if not the epicenter—of the crisis, and an ideal opportunity to provide MAT to patients and reduce overdose deaths and other harms from OUD.

55.     Colorado's goal in providing funding for MAT in jails was therefore to treat patients like Ms. Lopez suffering from OUD, to prevent overdose deaths both in jails as well as the community, as well as to provide necessary medical treatment while in jail and on a continuous basis once the patient returns to the community.

56.     At all times relevant the federal government provided substantial grants for MAT program in jails—grant money that Mesa County accessed when creating their jail based MAT program at the time of Ms. Lopez's death.

57.     At all times relevant, Mesa County received grant funding from Colorado to provide MAT in the jail.

58.     The County then contracted with NaphCare in 2020 to provide medical, mental health, and substance use treatment in the jail, including administering the MAT program

17

pursuant to JBBS state and federal funding.

59.     Effective MAT plans must account for a patient's history of OUD and their medical history. Every practitioner understands that, generally, higher doses of medications are required to effectively treat patients who have severe opioid use and a higher tolerance for opioids—this is particularly true in the case of people taking fentanyl.

60.     MAT usually involves prescribing Buprenorphine (Suboxone) or Methadone. Methadone is the stronger of the two medications, and necessary for patients when Buprenorphine is inadequate to stop cravings. Methadone has been prescribed for longer than Buprenorphine and is known by professionals in the field as the gold standard of care for Opioid Use Disorder. This is particularly the case for patients with more severe Opioid Use Disorder, and for patients who have previously been prescribed Methadone, like Ms. Lopez.

61.     Providers of MAT must take into account a well-known risk that Buprenorphine can trigger "precipitated withdrawal," in which an initial dose of Buprenorphine can trigger or exacerbate withdrawal symptoms. a condition that aggravates existing withdrawal symptoms. Precipitated withdrawal creates a rapid onset of withdrawal symptoms such as nausea, diarrhea, and vomiting. To avoid causing precipitated withdrawal, providers know that Buprenorphine should not be administered until a patient is showing objective signs of withdrawal.

62.     Should precipitated withdrawal occur, the standard of care is to rapidly increase the Buprenorphine dosage to treat the precipitated withdrawal and avoid undue pain and suffering.

**NaphCare Defendants' Deliberate Indifference Denying Ms. Lopez Medication**

63.     As alleged herein, the NaphCare Defendants failed to treat Ms. Lopez with MAT

18

leading to her death in May of 2022, despite specific requests by Ms. Lopez for MAT, in deliberate indifference to the obvious and substantial risk of overdose death. However, their deliberate indifference is also informed by the failure to properly treat Ms. Lopez for her severe opiate use disorder from the moment she entered the jail in January of 2022.

64.     As alleged herein, on January 14 when booked into the jail, Ms. Lopez reported to NaphCare Defendants including Kassi McDonald, who documented it in the chart, her severe opiate use disorder and fentanyl addiction, including her recent use in the preceding 24 hours. NaphCare Defendants knew Ms. Lopez's medical history as alleged herein called for medication maintenance, either on Methadone or Buprenorphine.

65.     NaphCare Defendants also knew and documented that Ms. Lopez had to be hospitalized prior to entering the jail on January 14, due to the severity of her drug use at that time.

66.     On January 14, Defendant Casey Gladney, a Corporate NP, reviewed Ms. Lopez's chart and her severe OUD history. Defendant Gladney prescribed Ms. Lopez with an automatic 5-day Buprenorphine taper. Defendant Gladney ordered the taper to begin when Ms. Lopez's COWS withdrawal score exceeded 6. This meant that per Defendant Gladney's orders, Ms. Lopez would be administered Buprenorphine when nurses recorded adequate withdrawal symptoms, and would proceed to taper Ms. Lopez off Buprenorphine according to NaphCare policies over the course of 5 days.

67.     Defendant Gladney failed to prescribed MAT for Ms. Lopez, and instead prescribed the opposite—a quick taper down off medication as Ms. Lopez suffered withdrawal— in deliberate indifference to her medical needs and the known and obvious risks of relapse and

overdose.

68.     On January 15, Defendant Kass McDonald, Director of Nursing, recorded a COWS withdrawal score of 7 for Ms. Lopez. Per the plan ordered by Defendant Gladney, this triggered the 5-day Buprenorphine taper. Defendant Scott Moran, Corporate NP, then prescribed 4mg, starting the 5-day taper per NaphCare protocols. Defendant Moran necessarily reviewed Ms. Lopez's chart and knew she suffered severe OUD. Like Gladney, Defendant Moran also failed to prescribe MAT maintenance and instead ordered a quick taper down, in deliberate indifference to her medical needs and the known and obvious risks of relapse and overdose.

69.     NaphCare Defendants also failed even to tailor the taper protocol to Ms. Lopez's needs, in deliberate indifference. Prior to Ms. Lopez being administered the Buprenorphine, around 6:00pm on January 15, NaphCare Defendant Jenna Raymond, LPN, recorded a COWS score for Ms. Lopez of just 1, meaning it was improper to initiate Buprenorphine because she was not experiencing sufficient indicia of withdrawal. As all NaphCare Defendants knew, starting Buprenorphine too early causes precipitated withdrawal.

70.     At approximately 9:00pm, Defendant Jessica Busheri (RN) administered Ms. Lopez the first dose of Buprenorphine at 4mg, per the instructions of Defendants Gladney and Moran. Predictably, given she was not then experiencing adequate withdrawal, this caused Ms. Lopez's withdrawal symptoms to skyrocket. She became extremely nauseous, was visibly moaning, unable to walk, had to crawl on the floor to assessments by NaphCare Defendants, and was obviously experiencing extreme pain and distress from precipitated withdrawal.

71.     Multiple NaphCare Defendants, including Defendant Karen Pooley (RN), witnessed Ms. Lopez's increasing withdrawal symptoms throughout their shift the evening of

January 15 to the early morning of January 16, yet failed to take action to treat Ms. Lopez's withdrawal. The early morning hours of January 16, Defendant Pooley observed Ms. Lopez's skyrocketed withdrawal symptoms and recorded a COWS score of 10.

72.     Defendant Pooley reported Ms. Lopez's severe withdrawal symptoms to Defendant Andrew Higginbotham, Corporate NP, around 4:30am on January 16. Defendant Higginbotham learned Ms. Lopez was not doing well, was sweaty, had to crawl on the floor to her assessment with the nurse, was moaning, was visibly uncomfortable, and obviously suffering intensely terrible withdrawal. Despite this, both Defendants Pooley and Higginbotham decided Ms. Lopez's would "detox," and failed to request or initiate increased medication to treat Ms. Lopez. These Defendants also knew Ms. Lopez's chart and that she required MAT as a severe OUD patient, but failed to provide it in deliberate indifference to her medical needs and the risk of overdose death.

73.     As alleged herein, all MAT providers and medical professionals involved in MAT, including NaphCare Defendants, know that the treatment for precipitated withdrawal is to substantially increase the Buprenorphine dosage. For a severe OUD patient like Ms. Lopez, that would mean dramatically increasing the low dose of 4mg to at least 8mg or 16mg or more, immediately, to reverse the precipitated withdrawal.

74.     Despite this, NaphCare Defendants failed to increase and in fact titrated down the already low Buprenorphine dose being administered to Ms. Lopez, as part of the 5-day taper and "detox" protocol that NaphCare implemented, in deliberate indifference to Ms. Lopez's known and obvious needs.

75.     For a heavy fentanyl user like Ms. Lopez, the average Buprenorphine dose is 16-

24mg. NaphCare Defendants, including Defendant Scott Moran (NP), a corporate provider, prescribed and administered the low dose of 4mg between January 15-18, and then just 2mg between January 18-20, which they knew would both precipitate withdrawal and then fail to treat withdrawal symptoms she experienced, causing needless and severe pain and suffering for days.

76.     NaphCare Defendant Megan Marah, RN, also assessed Ms. Lopez personally and was involved in her care on numerous occasions while she suffered withdrawal, and then suffered being denied MAT. On January 16, 17, 18, and 24-26, at least, Defendant Marah engaged with Ms. Lopez's care, including necessarily reviewing her chart. Ms. Lopez visibly suffered and reported withdrawal as alleged herein which Defendant Marah observed, and Marah knew Ms. Lopez was a severe OUD patient requiring MAT. Despite this, she failed to refer Ms. Lopez or take any action to ensure she received this care, indeliberate indifference.

77.     Between January 16 and 21, Ms. Lopez suffered such severe withdrawal that she was vomiting on herself, was heard by staff audibly moaning in her cell, sweating, she was tachycardic (abnormal heart rate was continually over 100 and often around 135), she was unable to consume liquids or eat, and could not even stand for evaluations. Throughout this time period, multiple NaphCare Defendants, including Defendants Pooley, Gardner, McDonald, Marah, Moran, knew Ms. Lopez was suffering severe withdrawal, yet failed to take action.

78.     During this time period, Ms. Lopez specifically told Defendants the low doses of Buprenorphine prescribed had made her feel worse—all clear sign to any medical provider than Ms. Lopez was in precipitated withdrawal necessitating a sharp increase in dosage.

79.     NaphCare Defendants failed to prescribe or offer to Ms. Lopez a higher Buprenorphine dose, and failed to educate her or inform her that a higher dose would alleviate

her withdrawal symptoms. By denying Ms. Lopez a higher dose, and instead prescribing a low dose which inflicted precipitated withdrawal, NaphCare Defendants caused Ms. Lopez to suffer unnecessary withdrawal throughout this time period.

80.     On January 21, Defendants McDonald and Gladney knew and recorded that Ms. Lopez was still suffering from withdrawal symptoms, had GI problems, chills, abnormal vital signs including elevated heart rate, and had not eaten in six days, indicating untreated OUD symptoms or withdrawal.

81.     Ms. Lopez's withdrawal symptoms, which NaphCare Defendants both helped cause through precipitated withdrawal and then failed to treat with increased dosages, were known and obvious to anyone around her. Ms. Lopez reported the symptoms, which were also visible and obvious. Staff, other detainees, and anyone interacting with Ms. Lopez could see she was suffering severe pain and suffering from withdrawal and necessitated increased medication which NaphCare Defendants systematically denied consistent with company policies, procedures, practices, and training.

**NaphCare Defendant Heather Stanford has Failed to Ensure Ms. Lopez Received MAT**

82.     On January 23, NaphCare Defendant Heather Stanford, HSA, assessed Ms. Lopez and her medical chart. As the Health Services Administrator, Defendant Stanford was responsible for overseeing and coordinating NaphCare's duties of care to Ms. Lopez, including medication to treat her severe OUD. Despite knowing Ms. Lopez required MAT maintenance, Defendant Stanford cleared Ms. Lopez to be removed from the "detox protocol" and to discontinue any further medication to treat Mr. Lopez's OUD, in deliberate indifference to the known and obvious need for MAT.

23

83.     As the onsite HSA, Defendant Stanford was aware of Ms. Lopez's care in the jail by NaphCare, including her medical chart and various medical needs. Defendant Stanford knew Ms. Lopez's history of medication for OUD including Methadone, informing her Ms. Lopez required MAT.

84.     Defendant Stanford had an obligation to ensure Ms. Lopez was seen by a provider for MAT—particularly after Ms. Lopez repeatedly requested MAT—but failed to do so, in deliberate indifference to the known and substantial risks to Ms. Lopez.

**NaphCare Defendants Knew Ms. Lopez Was "Dope Sick" And Desperately Needed MAT**

85.     NaphCare Defendant Jessica Gardner NP was an "in house" provider working in the jail, with the ability and duty to prescribe medication as needed for her patients and refer them for treatment for any needs outside of her practice area, including MAT for Ms. Lopez. Defendant Gardner conducted numerous health evaluations and assessments of Ms. Lopez and reviewed her medical history, and was aware of Ms. Lopez's chronic and severe OUD and the need for medication maintenance.

86.     Defendant Gardner was personally aware of Ms. Lopez's severe withdrawal from fentanyl as alleged herein and that her severe OUD necessitated MAT maintenance.

87.     On January 24, 2022, Defendant Gardner discontinued opiate medication for Ms. Lopez, rather than prescribe continuing MAT as was the standard of care and obviously required for Ms. Lopez. In knowing disregard of the risks of overdose and death, Defendant Gardner discontinued and failed to prescribe MAT.

88.     On February 2-3, Defendant Gardner again assessed Ms. Lopez who reported and was visibly experiencing symptoms of anxiety, depression, chest pains, and other symptoms

24

consistent with her OUD. Defendant Gardner again failed to prescribe, offer, or refer for MAT.

89.     On February 2, 2022, Ms. Lopez was also seen in medical by Defendant Neil Sanchez, Mental Health Professional, who documented that Ms. Lopez was reporting "being dope sick" and numerous symptoms consistent with that, including sleep disturbances, high anxiety, depression, difficulty coping in the jail, and experiencing suicidal ideation.

90.     Ms. Lopez specifically reported taking medication and also requested medication both for mental health symptoms, as well as for her "dope sick" symptoms from OUD.

91.     Despite Ms. Lopez's report of symptoms and being "dope sick" and requesting medication, Defendant Sanchez failed to urgently refer Ms. Lopez to a provider for MAT assessment and medication, in deliberate indifference to the known and obvious need for medication maintenance.

92.     Defendant Gardner, NP, both personally assessed Ms. Lopez in medical on February 2, and was ware of Defendant Sanchez's assessment in medical on that same date that she was "dope sick" and requested medication which was documented in Ms. Lopez's medical chart. Despite this, Defendant Gardner again failed to prescribe Ms. Lopez MAT, or immediately refer her to a provider for MAT, in deliberate indifference to the known and obvious need and the risks to her life and health that would result.

93.     On February 8, 2022, NaphCare Defendant Julie Mamo received a request from Ms. Lopez for help for her OUD, including a request to talk to Ms. Mamo "ASAP" about applying for a women's recovery center. Showing Ms. Lopez was dedicated to treatment and recovery, she also expressed interest in applying to a university. Despite this indication of requested treatment, Defendant Mamo failed to notify any MAT provider that Ms. Lopez needed

an evaluation for MAT care in the jail.

94.     On February 23, 2022, Defendant Gardner conducted a Chronic Care assessment of Ms. Lopez. Defendant Gardner knew from Ms. Lopez's documented medical history she suffered chronic severe opiate use disorder dating back to being a teenager, including a history of Methadone maintenance. Despite this, Defendant Gardner failed to prescribe or offer MAT to Ms. Lopez, in deliberate indifference to a known and obvious medical need and the substantial risks to Ms. Lopez.

95.     On April 18, Defendant Gardner assessed Ms. Lopez in person for medical care needs. In doing so, she reviewed Ms. Lopez's chart which contained the notes that Ms. Lopez had repeatedly requested the MAT Program and requested to see the MAT provider to receive medication for her opiate use disorder, noted in the system as of March 26. Despite this, Defendant Gardner failed to prescribe MAT, failed to schedule Ms. Lopez for MAT evaluation, and failed to take any other action consistent with her duties, in deliberate indifference to Ms. Lopez's medical needs.

96.     The information learned by Defendants Sanchez and Gardner, that Ms. Lopez was "dope sick," had taken medication previously for OUD, and that she requested medication, was charted in her records and known to NaphCare Defendants involved in Ms. Lopez's care after February 2.

### NaphCare Defendant Jessica Busheri RN-MAT Deliberate Indifference

97.     Defendant Jessica Busheri was NaphCare's designated "RN-MAT" professional in the jail at all times relevant. Although all NaphCare Defendants knew the dire need for MAT for Ms. Lopez as alleged herein, as the RN-MAT, Defendant Busheri was also aware of the

urgent necessity to provide MAT treatment to people like Ms. Lopez, suffering severe, chronic opiate use disorder.

98.     Defendant Busheri was involved in assessing Ms. Lopez, administering medication, and providing other care to Ms. Lopez, on dozens of occasions from January-May of her stay in the jail leading up to her death. Like all NaphCare Defendants, she also reviewed Ms. Lopez's chart and was aware of its contents as alleged herein, including her prior Methadone maintenance.

99.     Defendant Busheri also assessed Ms. Lopez and her medical chart on January 28, 2022, noting Ms. Lopez was no longer on opiate detox protocol and was no longer being provided medication for OUD or withdrawal. On January 28, Ms. Lopez reported to Defendant Jessica Busheri (RN-MAT) continuing nausea and vomiting, and she required additional medication.

100.     Despite this knowledge and Ms. Lopez's obvious need for MAT, Defendant Busheri failed to assess Ms. Lopez for MAT, failed to recommend MAT, failed to refer or schedule her for an MAT provider, and failed to take any other action necessary to ensure Ms. Lopez received this necessary care.

101.     Defendant Busheri administered medication and interacted with Ms. Lopez dozens of times thereafter in February, March, April, and May of 2022, and knew she was not being prescribed or administered MAT medication, contrary to the standard of care and in deliberate indifference to Ms. Lopez's obvious medical needs. Despite this, Defendant Busheri continually failed to refer or offer MAT up through the time of Ms. Lopez's death.

**NaphCare Defendants Failed to Provide MAT Despite Repeated Requests**

102.     As alleged herein, NaphCare Defendants had a duty to offer and prescribe MAT to Ms. Lopez, including Methadone, even if she had not specifically requested it, given her medical history and obvious needs, which they failed to do.

103.     But NaphCare Defendants' deliberate indifference is all the more glaring because Ms. Lopez did repeatedly request treatment—including MAT—to treat her severe OUD. Had Defendants done so, Ms. Lopez's overdose death would have been prevented.

104.     On February 2, 2022, Ms. Lopez requested drug and alcohol treatment, including education. Rather than offer MAT promptly to her, Defendant Michele Wilkie, a mental health counselor providing JBBS and Substance Use Disorder services informed Ms. Lopez that there was a waitlist for services, and failed to provide Ms. Lopez intake paperwork for over one week. Demonstrating how desperately she needed help, Ms. Lopez signed and returned the paperwork for substance abuse treatment within one day.

105.     As alleged above, also on February 2, 2022, Ms. Lopez explained she was "dope sick" and requested medication, and again reported she'd previously taken medication for OUD, which was documented in her chart and known by all NaphCare Defendants.

106.     Defendant Wilkie knew Ms. Lopez suffered severe OUD and that her request for help was a key opportunity to provide badly needed treatment, especially MAT. Rather than immediately refer Ms. Lopez for MAT, Defendant Wilkie did nothing.

107.     On February 25, 2022, Defendant Wilkie conducted a mental health evaluation of Ms. Lopez. Defendant Wilkie knew from Ms. Lopez's chart that she had OUD and received medication treatment in the past. Ms. Lopez also informed Defendant Wilkie directly that she

received treatment previously for OUD, including while incarcerated in Florida. Defendant Wilkie documented Ms. Lopez's opioid dependence (OUD), and knew Ms. Lopez needed MAT to treat this chronic disease.

108.     Making obvious the severity of Ms. Lopez's chronic OUD, Ms. Lopez told Defendant Wilkie she used "blues," a term for fentanyl, every day since age 18.

109.     In deliberate indifference, Defendant Wilkie failed to refer Ms. Lopez for MAT or do anything to ensure she received medication maintenance for her OUD, instead shockingly recommending that Ms. Lopez seek treatment after her release from jail—which she knew meant the grave risk of overdose death Ms. Lopez would face in the meantime, and which was in violation of the duty to provide MAT in the jail.

110.     Defendant Wilkie merely recommended that Ms. Lopez participate in JBBS group therapy sessions in the jail, failing to recommend or refer for MAT maintenance which Ms. Lopez desperately needed while in the jail.

**Ms. Lopez Again Requests MAT And NaphCare Defendants Fail To Treat**

111.     Suffering untreated OUD, Ms. Lopez continued to request help from the NaphCare Defendants, who continued to fail to provide her the care they knew she obviously needed.

112.     On March 16, Ms. Lopez requested to speak with a provider about medication management using NaphCare's digital "kite" system in which jail detainees are required to make medical requests through the digital system. NaphCare Defendant Kimberly Sanchez (Mental Health Director) reviewed Ms. Lopez's request submitted a written response to Ms. Lopez that she would be scheduled for an appointment at an unspecified date, in deliberate indifference to

Ms. Lopez's request for care.

113.    On March 21, records indicate Ms. Lopez digitally reviewed Defendant Sanchez's response to her request for medication. The same day, Ms. Lopez immediately submitted an additional request further specifying she was requesting the "MAT program," which Defendants knew meant medication for her documented and severe OUD.

114.    Defendant Sanchez received Ms. Lopez's request for "MAT program" on March 22, the next day. Rather than immediately take action and ensure she received care, Defendant Sanchez callously responded by digital message Ms. Lopez that she should send a kite to medical. Defendant Sanchez failed to refer Ms. Lopez for MAT or notify a MAT provider or other appropriate staff, in deliberate indifference to Ms. Lopez's request for care.

115.    Moreover, MAT services are part of mental health and substance abuse care (OUD is a mental health condition as well), and as the Mental Health Director Defendant Sanchez had a duty to ensure this mental health and medical need was met for Ms. Lopez, particularly given the dangers of overdose. She filed to meet this duty, in deliberate indifference.

116.    Ms. Lopez received and reviewed Defendant Sanchez's digital message on March 23. Once again, Ms. Lopez immediately and on that same day again requested treatment, reflecting she urgently desired MAT medication. She sent yet another kite specifically requesting "MAT," which Defendants knew meant medication for her untreated and severe OUD.

117.    Due to NaphCare's deficient policies and practices as alleged herein denying and delaying care, including its systematic failure to provide MAT, NaphCare Defendants failed to timely review Ms. Lopez's March 23 request for MAT, waiting three days to even review Ms. Lopez's request for MAT.

30

118.    On March 26, Defendant Jenna Raymond responded to Ms. Lopez telling her that she was "scheduled to be seen by the MAT provider", but failed to inform Ms. Lopez of any date or even a timeframe.

119.    In fact, no assessment or treatment by any "MAT provider" would be offered or provided to Ms. Lopez. Records show no appointment for MAT was ever scheduled for Ms. Lopez. Defendant Raymond failed to schedule Ms. Lopez to be seen by an MAT provider, following NaphCare policies, practices, and training. Defendant Raymond knew Ms. Lopez would be waiting for months if not longer to receive MAT, or would likely be denied MAT maintenance entirely, yet failed to inform Ms. Lopez and failed to take any other necessary action to ensure Ms. Lopez received timely MAT she desperately needed, in deliberate indifference to the known and obvious risks to Ms. Lopez, including the risk of overdose.

120.    Moreover, NaphCare's protocols fail to indicate any specific person was even the "MAT provider" as Defendant Raymond appears falsely to have suggested. Rather, as alleged herein, a number of Corporate NPs remotely were authorized to prescribe MAT medications but failed to do so, other remote providers including Defendant Doctor Jeffrey Alvarez were authorized to prescribe MAT but failed to do so, and on-site providers either failed to prescribe MAT themselves or failed to ensure Ms. Lopez was prescribed MAT in the jail.

121.    Immediately upon seeing Defendant Raymond's response on March 26, Ms. Lopez sent a kite requesting a one on one meeting with a chaplain, again reflecting the suffering she was enduring on a daily basis, including anxiety, cravings, and insomnia, due to her untreated OUD.

122.    On April 4, Ms. Lopez sent yet another mental health kite asking when she would

be seen by the provider. After two days, Defendant Robert Emery, responded to Ms. Lopez in a message stating she was on "the provider's" schedule but failing to provide a date or timeframe. After receiving this response, Ms. Lopez again requested a one on one meeting with a chaplain due to the turmoil she was enduring untreated.

123.    Defendant Emery also knew from personally assessing Ms. Lopez, and from her chart, that she required MAT maintenance for severe OUD. On January 25, Ms. Lopez reported her substance use disorder personally to Emery, and sated she had been provided medication while incarcerated in Florida. On January 18, while Ms. Lopez was suffering extremely painful withdrawal, he also observed Ms. Lopez in a cell and attempted to engage her, but Ms. Lopez was so ill she was unable to respond to him, reinforcing the severity of her OUD and withdrawal. In deliberate indifference, he failed to refer her for MAT or take any action to ensure she received MAT maintenance.

124.    NaphCare Defendant Carrie Shahbahrami, a psychiatric NP able to prescribe medication, also personally treated Ms. Lopez and was involved in her care, including reviewing Ms. Lopez's chart, and also knew her medical history of severe OUD and prior mediation maintenance as alleged herein. Defendant Shahbahrami ordered treatment, including non-MAT medications, on February 2, 3, 8, May 4, May 9, and May 12. Defendant Shahbharami also conducted a psychiatric evaluation of Ms. Lopez on February 8, 2022, in which she observed symptoms and a medical history of OUD, which Ms. Lopez also directly reported to her and documented as Substance Use Disorder (SUD). Defendant Shahbharami also knew Ms. Lopez had been incarcerated previously and prescribed medication. Despite Ms. Lopez specifically reporting her SUD, Defendant Shahbharami failed to refer Ms. Lopez for MAT evaluation or for

MAT treatment, in deliberate indifference to the risks.

125.    Defendant Shahbharami also documented progress notes with Ms. Lopez on May 14, in which she observed Ms. Lopez's ongoing symptoms consistent with untreated OUD, including irritability and other symptoms. Defendant Shahbharami knew Ms. Lopez was not receiving MAT maintenance despite suffering OUD, yet once again failed to offer or refer Ms. Lopez for MAT.

**Ms. Lopez Again Requests MAT In May and NaphCare Defendants Fail to Provide**

126.    By May of 2022, Ms. Lopez was still waiting to see the "MAT provider" per the claims of numerous NaphCare Defendants that she had been "scheduled." However, she once again took action and requested MAT.

127.    On May 4, Ms. Lopez requested the MAT program through a kite to medical, further specifying her request for the "MAT PROGRAM" in all caps, hoping to get their attention. NaphCare Defendants again field to timely respond. After three days, on May 7, Defendant Tan-Torres (LPN) submitted a digital response to Ms. Lopez stating she was scheduled to be evaluated by the MAT provider, but failing to provide a date or even a timeframe. Defendant Tan-Torres stated "the list is lengthy," and callously told Ms. Lopez to be "patient".

128.    Like other Defendants' failed response to Ms. Lopez's requests for MAT, Defendant Tan-Torres failed to ensure Ms. Lopez was promptly seen by a provider, failed to inform Ms. Lopez of any date, and failed to take any other necessary action to ensure Ms. Lopez received the urgent treatment she needed. Like Defendant Sanchez, it appears no appointment was even scheduled for Ms. Lopez, consistent with NaphCare policy of delaying and denying

MAT maintenance.

129.    As alleged herein, NaphCare's records were maintained centrally and digitally, including kites, medically notes, and other activities by NaphCare staff, accessible to all. When involved in Ms. Lopez's care, NaphCare Defendants would view her medical charts and notes, as well as her digital kites and repeated requests for MAT, and various staff responses, as alleged herein.

**Deliberate Indifference of NaphCare Defendants Who Treated Ms. Lopez And Reviewed Her Chart**

130.    NaphCare Defendant Elliot Wade, MD, was also involved in Ms. Lopez's care on numerous occasions, and necessarily reviewed her chart and its contents, and knew she had OUD and required MAT as alleged herein. On at least April 7 and May 8 of 2022, Defendant Wade ordered various non-MAT treatment for Ms. Lopez. In doing so he also failed, like the other NaphCare Defendants, to prescribe or refer her for MAT, in deliberate indifference to the known risks.

131.    Similarly, NaphCare Defendant Gabriala Orozco, Corporate NP, provided treatment to Ms. Lopez and necessarily reviewed her chart and its contents, and knew she had OUD and required MAT as alleged herein. On at least April 10,

**NaphCare Defendants Knew Fentanyl In The Jail Posed A Deadly Risk Of Overdose To Untreated Severe OUD Patients Like Ms. Lopez**

132.    By May of 2022, Defendants knew Ms. Lopez had been off opiates and denied MAT for months. As a severe OUD patient with longtime fentanyl addiction, the danger to her was deadly serious, substantial, and obvious. Defendants knew fentanyl often spread in the jail, and they knew while untreated with MAT Ms. Lopez in particular would be unable to resist

using, suffering extremely high risk of overdose—a known danger NaphCare publicly acknowledged.

133.     Defendants knew the supposed "lengthy list" for MAT treatment—in reality its denial of care—meant NaphCare, the County, and the staff in the jail were denying Ms. Lopez, and likely other patients, necessary treatment for opiate use disorder. Given the presence of fentanyl and other drugs in the jail, they knew this meant Ms. Lopez faced the serious risk of relapse and overdose.

134.     Defendants also knew this risk was many times greater because by now, with several months untreated in the jail, Ms. Lopez was physiologically opiate naïve, meaning even a single use of fentanyl that she might have been able to tolerate previously, could easily cause overdose and death.

135.     Naphcare Defendants were not only aware of the fatal danger faced by people like Ms. Lopez, Defendants also understood they controlled the keys to recovery and safety and were locking Ms. Lopez out. They knew MAT for OUD while a person is incarcerated dramatically reduces overdose risks and deaths both within jail and after release.

136.     NaphCare also knew Ms. Lopez had been successfully treated with MAT including Methadone while incarcerated previously, and while treated in that setting had not relapsed. This further informed them providing MAT to Ms. Lopez while in jail was essential to her health and life, and failing to provide it fatally dangerous.

**NaphCare Chief Medical Officer Jeffery Alavarez Deliberate Indifference**

137.     NaphCare Defendant Jeffrey Alvarez, MD, CCHP, was at all times relevant the Chief Medical Officer for NaphCare as to Mesa jail. Defendant Alvarez is individually liable as

alleged herein, and as a policymaker and decisionmaker for the company NaphCare is liable as alleged herein.

138.    Defendant Alvarez developed NaphCare's policies, protocols, procedures, practice, supervision and training, for its MAT program in the jail, and was directly involved in the process of NaphCare securing the contract and implementing these services in Mesa jail.

139.    Defendant Alvarez served on NCCHC committees and knew its position statement regarding MOUD/MAT services in jails. Defendant Alvarez also had substantial experience prescribing MAT as a provider.

140.    Defendant Alvarez oversaw clinical care in the jail and was personally involved in Ms. Lopez's failed care in this case, including reviewing her medical chart and prescribing medication. Utilizing NaphCare's centralized medical record system, Defendant Alvarez was aware of Ms. Lopez's chart informing him of her severe OUD, her ongoing and recent fentanyl use, her prior Methadone maintenance, and the rest of her medical history as alleged herein, which informed him Ms. Lopez required MAT to treat her OUD.

141.    Despite knowing Ms. Lopez needed MAT maintenance in the jail, Defendant Alvarez failed to prescribe it or ensure another NaphCare provider did, in deliberate indifference to the obvious and substantial risks to her health and life, including fentanyl overdose.

142.    Showing his involvement in her care, Defendant Alvarez prescribed other non-MAT medication to Ms. Lopez, necessarily reviewing her chart to do so, including on January 14, 15, and 16, of 2022, as she was also suffering terrible withdrawal. Defendant Alvarez also prescribed other non-MAT medication to Ms. Lopez on January 28, 2022, and on April 7, 2022.

143.    By April, Ms. Lopez had repeatedly requested MAT as her chart repeatedly

36

confirmed.

144.    When reviewing her chart to prescribe medication, from the date she entered the jail and on a continuing basis up to the time of her death, Defendant Alvarez was responsible for ensuring Ms. Lopez received necessary care, including MAT. He not only knew Ms. Lopez needed MAT based on her obvious medical history, he knew from the chart she was specifically requesting the MAT program that Defendant Alvarez knew he had a duty to prescribe and oversee in the jail. Despite this, he failed to prescribe her MAT, and failed to refer her or ensure she received this desperately needed medication treatment on an ongoing basis up through the time of her death by fentanyl overdose, in deliberate indifference to her life and health.

145.    Defendant Alvarez as Chief Medical Officer for NaphCare was at all times relevant also a member of the NCCHC involved in various committees and boards. In fact, Defendant Alvarez himself chaired the 2018 revisions of the NCCHC Standards and is a physician surveyor for the NCCHC accreditation program. Thus, NaphCare leadership crafted the very NCCHC standards NaphCare failed to meet.

**NaphCare's Deliberately Indifferent Policies Failing to Provide MAT to Ms. Lopez**

146.    NaphCare's policies, procedures, practices, customs, supervision, and training (collectively "policy" or "policies") were a moving force in the constitutional violations by NaphCare Defendants alleged herein, in deliberate indifference to the fatal dangers to people like Ms. Lopez NaphCare knew it was creating, including without limitation the following:

147.    First, NaphCare implemented a policy of denying MAT for patients with OUD including Ms. Lopez, including by implementing a withdrawal and detox protocol which automatically requires a 5-day Buprenorphine taper down and termination of medication

treatment upon entry to the jail, and then failing to educate or prescribe MAT maintenance, denying MAT going forward and on a continuing basis.

148.    Second, NaphCare implemented a policy of denying MAT to OUD patients, including Ms. Lopez, who had already been prescribed MAT medication, in her case Methadone maintenance, despite this making it all the more obvious to NaphCare that MAT maintenance was necessary.

149.    Third, NaphCare implemented a policy of failing to offer MAT and instead denying MAT to OUD patients, including Ms. Lopez, even when they repeatedly request MAT medication and the MAT program.

150.    Fourth, NaphCare implemented a policy of falsely informing patients requesting MAT care that they are "scheduled" to be seen but are on a "waitlist," when in fact they are not schedule to be seen at all. This policy both denies care while falsely leading patients including Ms. Lopez to believe they will soon receive treatment, in reliance on NaphCare's false representations.

151.    Fifth, NaphCare implemented a policy of failing to treat opiate withdrawal and causing precipitated withdrawal, as it did to Ms. Lopez, by using low doses and systematically refusing higher doses of medication, even per its 5-day taper protocol. NaphCare knew this withdrawal policy meant not only patients like Ms. Lopez would suffer unnecessarily, but that they would become opiate naïve and therefore even more vulnerable to relapse and overdose death, due to NaphCare's policy.

152.    Sixth, NaphCare implemented a policy of failure to train or supervise staff which was a moving force in Ms. Lopez's death. All NaphCare staff acted consistent with NaphCare

policies including their training and supervision, and on information and belief no staff was disciplined or found to have acted outside company policy related to Ms. Lopez's death.

153.    As alleged herein, NaphCare implemented other policies which were also a moving force in causing the constitutional violations alleged.

154.    On May 20, after being repeatedly denied MAT care by NaphCare Defendants, Ms. Lopez died of a fentanyl overdose in the jail. Her death was the foreseeable result of Defendants' failures and NaphCare's policies. Had they provided MAT including Methadone or Buprenorphine, Ms. Lopez would not have died from a fentanyl overdose in the jail.

**NaphCare's Deliberate Indifference Shown Because It Knew How to Treat MAT**

155.    NaphCare's deliberate indifference is further shown because it had the knowledge and resources to provide MAT to Ms. Lopez, but simply failed to do so in callous disregard to her life and health.

156.    NaphCare was at all times relevant a large, national corporation headquartered Alabama, with tens of millions of dollars in revenue annually, with over 30 years of experience providing health care, mental health care, and substance use care, in dozens of jails and correctional institutions.

157.    NaphCare publicly represented itself as operating "on the front lines of the opioid" epidemic in corrections, and that it had "firsthand insight" into treating such substance use disorders in jails, including MAT.

158.    NaphCare knew prompt and streamlined MAT in jail was necessary to both treat OUD and to reduce and prevent relapses and overdoses from opiates, especially fentanyl. NaphCare publicly represented that it believed in the promise of MAT to treat patients in jails

and save lives.

159.     NaphCare knew delaying MAT even for a day could mean the difference between life and death.

160.     NaphCare utilized both on-site providers and staff as alleged herein, as well as remote "Corporate NPs" and doctors to prescribe medication including MAT by telehealth as needed, to ensure 24/7 access to care, including centralized records so that all medical staff, both on-site and remote, know a patient's medical needs.

161.     Through on-site and remote providers, NaphCare had the resources and capability to provide immediate care to Ms. Lopez, including MAT, but failed to do so.

162.     NaphCare publicly represented it recommended providing MAT medications, including Buprenorphine and Methadone, to treat patients within jails with chronic, severe OUD, and that it can conduct screenings and admissions for MAT treatment, but failed to do so for Ms. Lopez in Mesa jail, consistent with its actual policies as alleged herein.

163.     NaphCare represented it had the capability to prescribe MAT in the jail (both Buprenorphine and Methadone) to patients like Ms. Lopez, but failed to do so in deliberate indifference as alleged herein.

**Defendants Knew Drugs Including Deadly Fentanyl Was Smuggled Into The Jail, Placing OUD Patients Like Ms. Lopez In Grave Danger**

164.     Left untreated by the NaphCare and other Defendants as alleged herein, all Defendants knew that severe, chronic opiate users like Ms. Lopez would use opiates if the opportunity presented itself in the jail, including contraband fentanyl pills, due to the severity and grip of this chronic disease. They were also all keenly aware of the deadly risks of fentanyl,

40

and that a single pill laced with fentanyl could kill a patient like Ms. Lopez, who was a severe addict but had withdrawn.

165.    Defendants knew fentanyl (and other contraband) frequently was smuggled into the jail. Defendants knew this was an ongoing and serious problem, particularly in Mesa County.

166.    Grand Junction, where the jail is located, has Interstate 70 passing through it, and North-South highways in the vicinity. It has been for years a hub of fentanyl and other drug trafficking. Tens of thousands of pills containing fentanyl have been seized in highway busts and other drug interdictions, and those arrestees are then booked into the jail and often smuggle in drugs including fentanyl.

167.    The area also suffers from a substantial rate of fentanyl use and overdose deaths dating back years.

168.    On information and belief, multiple people incarcerated in Mesa jail have been hospitalized or treated for fentanyl use or overdose in the jail prior to Ms. Lopez's death.

169.    Mesa County jail is also a large jail with over 500 beds. Due to prevalence of fentanyl use, distribution, and trafficking through the area, a substantial number of people arrested and booked into the jail are known to possess fentanyl, often hidden within bodily cavities.

170.    Arrestees possessing fentanyl may be users/distributors or both, and often suffer their own serious OUD and addiction, similar to the severity of Ms. Lopez's chronic disease. As a result, fearing withdrawal and in the throes of the disorder, arrestees often attempt to smuggle fentanyl into the jail.

171.    It is also common knowledge, and has been for decades, that drug traffickers and

users may hide drugs like fentanyl in bodily cavities on booking into the jail, including the

vagina, rectum, mouth, and swallowing it into their body. All Defendants were aware of this, and

that it happened on a daily basis in jails like this throughout the country, including Mesa County.

172.    Defendants knew fentanyl is extremely deadly. Even a single pill laced with

fentanyl can kill. People smuggling pills in a bodily cavity are known to potentially smuggle

hundreds or even over a thousand pills. The pills are small enough that huge numbers of doses

can be smuggled in if jail security protocols are inadequate.

173.    Failure to identify, locate, seize, and prevent such fentanyl or other deadly

contraband from entering the jail has long been known by all Defendants to be of paramount

importance to the safety of people housed within. Defendants know people like Alizon Lopez

suffer severe OUD and will resort to using opiates, including pills laced with fentanyl,

particularly if not adequately treated with MAT, with a serious and obvious risk of overdose and

death.

174.    Given the danger presented by fentanyl especially, the County Defendants knew

security protocols, including adequate body scanning, cavity searches, isolation protocols, and

other safety measures, were essential to protecting the lives of people in the jail from fentanyl.

Despite this, they repeatedly failed to do so as alleged herein, consistent with the County's failed

policies, procedures, practices, training, and supervision.

175.    Defendants also knew the jail, including NaphCare as alleged herein, failed to

provide MAT maintenance to people like Ms. Lopez. County Defendants and security staff

monitor and interact with incarcerated people including Ms. Lopez daily, observe them in

withdrawal and suffering ongoing symptoms of untreated OUD.

42

176.    County Defendants knew from daily working in the jail that OUD patients like Ms. Lopez were not receiving MAT maintenance, placing them in substantial danger if fentanyl becomes available in the jail.

### Defendants Failed to Protect Ms. Lopez From Fentanyl-Laced Pills They Knew Were Flooding The Jail

177.    County Defendants individually and as a matter of Mesa jail policy failed to protect Ms. Lopez from the known and obvious risk of fentanyl overdose death in the leadup to her death. Despite glaring red flags and direct knowledge fentanyl was being smuggled into and spread throughout the jail—the women's units in particular—County Defendants responsible for jail safety failed to take necessary action, in deliberate indifference to the dangers of overdose death.

178.    On or about May 8, 2022, several individuals, Efrain Velez, Anna Munday and Vanessa Vasquez (Fentanyl Traffickers), were arrested in a drug bust transporting large quantities of pills laced with deadly fentanyl from Arizona into Colorado.

179.    Fentanyl Traffickers possessed blue pills labeled "M30," which typically indicates Oxycontin. However, as Defendants and the general public have known for years, such falsely labeled pills have been known to actually contain fentanyl which kills through overdose.

180.    Law enforcement suspected the Fentanyl Traffickers were both users and traffickers, and that they had hidden pills inside their bodies. The County Defendants learned this information as they participated in the arrest and transportation of these individuals and booked them into the jail.

181.    On May 8 while booking Velez into the jail, County Defendants Sgt. Bowen and

Defendants Pemberton, Kell, Huckins, and Dalrymple learned Velez had attempted to conceal a large amount of fentanyl in his body, both by swallowing or in his rectum. The officer who arrested Velez called and informed Defendants Velez may have swallowed a large amount of fentanyl.

182.    Reflecting efforts to hide the drugs, a bag of the M30 fentanyl pills was found in the MCSO patrol car used to transport Fentanyl Traffickers, information passed on to the County Defendants who participated in booking as alleged herein.

183.    After transport, and once inside Mesa jail, several M30 fentanyl-laced pills fell from Mr. Velez's pants, once again confirming the Fentanyl Traffickers were obviously hiding pills they would smuggle into the jail.

184.    Mr. Velez was booked, scanned, and strip searched, but no cavity search was conducted. While in the body scanner, operated by Defendant Deputy Daniel Kell, Mr. Velez was throwing up and sweating profusely, symptoms Defendants knew were likely the result of drug intoxication or overdose. Officers found nothing of note in the scans and strip search. This suggested pills he possessed had been partially consumed or handed off to his fellow Fentanyl Traffickers Ms. Munday and Ms. Vasquez.

185.    Indeed, prior to entering the jail Ms. Vasquez hid a large quantity of the M30 fentanyl laced pills—over one thousand pills—inside of her body.

186.    Defendant Bowen was informed by Defendant Simon (the transporting deputy for the arrestees) that Ms. Vasquez claimed concerned for Mr. Velez's well-being, claiming he had a condom filled with fentanyl pills in his rectum. However, nothing was seen in the scan for Mr. Velez.

187.    Defendants knew Vasquez was likely lying to misdirect suspicion away from her.

188.    Defendant Vasquez's statement Velez had fentanyl pills in a body cavity only further made obvious to Defendants that Vasquez herself was hiding fentanyl and must be carefully searched and isolated.

189.    Mr. Velez was scanned again by Defendant Deputy Kell, Defendant Deputy Whitney Huckins, and Defendant Sergeant Bowen. The Defendants saw nothing of note was seen on the scans, further confirming Vasquez was lying and indicating she possessed fentanyl.

190.    Mr. Velez became unresponsive and showed clear signs of overdose from swallowing fentanyl pills prior to his arrival. He was revived with Narcan and transported to Saint Mary's hospital.

191.    As a result of this initial series of events involving Velez, County Defendants had every reason to believe the Fentanyl Traffickers were hiding fentanyl, including Vasquez and Munday, and had particularly reason to further isolate and search Vasquez given her suspicious statements.

**County Defendants Knew Vasquez's Suspicious Behavior Meant She Had Fentanyl**

192.    Fentanyl Trafficker Vanessa Vasquez was also booked into Mesa jail on May 8, scanned, and searched by Defendants Sergeant Bowen and Defendant Pemberton, but no cavity search was performed or requested.

193.    Defendants observed an alarming anomaly in Ms. Vasquez's body scan images, indicating to them she was likely hiding M30 fentanyl-laced pills in her body.

194.    Ms. Vasquez's body scan showed a large, round shape in her vagina or rectum area, that is visible to lay person and was observed by Defendants, who had experience with and

a duty to identify such contraband.

195.    Defendants Bowen and Pemberton observed the abnormality in the body scan indicating Vasquez was likely hiding fentanyl in her body cavity. Based on this alone they had a duty to isolate her and monitor, request a cavity search, or take other measures to ensure fentanyl did not enter the jail, but failed to do so in deliberate indifference.

196.    Adding to the suspicions about Ms. Vasquez, she also falsely claimed to Defendants she had uterine cancer—a transparent attempt to misdirect or excuse an abnormality in her body scan.

197.    Defendants knew Fentanyl Traffickers, as well as users, will lie and manipulate in order to hide their activities. They knew Ms. Vasquez's statement indicated she was hiding something in her body she did not want them to find.

198.    Defendants also knew Vasquez gave a false name in booking, in further suspicious behavior indicating she was attempting to conceal the truth about her identity and criminal activities.

199.    Defendants also knew from their training and experience with drug traffickers and users that Vasquez's attempts to direct suspicion toward Velez, her co-defendant, was misdirection and only further indicated she was concealing fentanyl herself.

200.    Fentanyl Traffickers including Vasquez left pills and clues like proverbial bread crumbs: Vasquez was arrested for trafficking huge amounts of fentanyl, M30 pills were found in the car she'd been arrested in, M30 pills were found in the law enforcement transport vehicle, her co-defendant and boyfriend Velez was smuggling fentanyl into the jail, and her suspicious statements and body scan images flagged she was hiding pills in her body.

201.    Defendants knew protocols should be followed to ensure the Fentanyl Traffickers did not smuggle and distribute deadly fentanyl in this jail. Those procedures included conducting careful cavity searches to identify and seize the fentanyl from their bodies, as well as isolating and monitoring the traffickers from other arrestees and detainees so that no fentanyl is distributed and spread within the jail.

202.    Had County Defendants acted to conduct cavity searches and/or isolate these individuals, the fentanyl that killed Ms. Lopez would never have been distributed to her, and she would not have died of an overdose.

203.    Consistent with failed County policies, practices, procedures, customs, training and training, Defendants failed to pursue these or any other reasonable means to protect people like Ms. Lopez housed within the jail from the spread of fatal fentanyl pills.

**County Defendants House the Fentanyl Traffickers Together, Enabling the Spread of Pills**

204.    Throughout this time period in booking, the County Defendants observed more and more warning signs that Vasquez and Munday would distribute fentanyl in the jail, that they ignored in deliberate indifference to the risks.

205.    On May 8, Defendant Deputy Pemberton noted that Ms. Vasquez was acting suspiciously in booking and observed Ms. Vasquez spent hours at a time in the bathroom area. Even other detainees noticed and reported Ms. Vasquez's suspicious behavior.

206.    On or about May 8, Defendant Pemberton observed Ms. Vasquez acting very suspiciously consistent with drugs concealed in her body. Ms. Vasquez was using the toilet excessively (indicating retrieving drugs from cavities) and acting very strange. Defendant Pemberton knew this was suspicious and further observed Ms. Vasquez appearing to defecate

47

into a milk carton, and then pretending to just be picking up trash to conceal what came out of her body (i.e. pills).

207.    Defendant Pemberton reported her observations and suspicions to Defendants Bowen and Tate, the Sergeants on duty and supervisors responsible for overseeing the process.

208.    Despite knowing this behavior meant Ms. Vasquez was likely hiding contraband fentanyl, Defendants Pemberton and Bowen failed to take any action at that time, failing to search Ms. Vasquez, failing to seek a cavity search, failing to isolate Ms. Vasquez pending further investigation, and failing to do anything else to prevent fentanyl from spreading into the jail.

209.    Defendants also observed Ms. Vasquez awake at various hours of the night, suspiciously moving her mattress around, and requesting that other detainees watch her mattress when she left the cell.

210.    All of this suspicious behavior further indicated to Defendants that Vasquez was hiding M30 fentanyl pills she could and would spread throughout the jail.

**County Defendants Allow Munday and Vasquez To Freely Mingle Despite Known Risks**

211.    County Defendants Sergeants Bown and Tate, and Defendants Deputies Simon, Pemberton, were involved in screening, booking, and moving Defendants Munday and Vasquez in the booking and holding cells on May 8-9. Despite the known and obvious risks fentanyl would spread between them and to others, they failed to take action to isolate or separate the Fentanyl Traffickers, and instead allowed them to interact with each other and other women.

212.    They failed to separate or isolate Munday from Vasquez to ensure no fentanyl or other contraband was passed.

48

213.     During this time period of freely interacting, Vasquez passed hundreds of the M30 counterfeit fentanyl-laced pills to Munday.

214.     These interactions and handoffs were visible and caught on video.

215.     Prior to video arraignment on May 9, Ms. Vasquez was visibly passing a white item from one hand to the other in an attempt to avoid detection from the officer.

216.     Defendants then sat Ms. Vasquez and Ms. Munday physically right next to each other during arraignment. Ms. Munday then followed Ms. Vasquez to the bathroom

217.     Ms. Munday was visibly now in possession of a white item after Defendants enabled physical interaction between Munday and Vasquez.

218.     Ms. Vasquez and Ms. Munday were then again placed into the same holding cell in booking for several more hours, where more opportunity for passing fentanyl occurred. Rather than separate and isolate them pending ensuring they were not spreading fentanyl, they let them freely interact and even use the bathroom together, where further smuggling and hiding would occur. During this time, Ms. Vasquez distributed to Ms. Munday hundreds of M30 fentanyl-laced pills which Ms. Munday would soon spread into the general population, including to Ms. Lopez.

**County Defendants Failed to Protect Ms. Lopez From the Fentanyl-Laced Pills Spreading throughout Mesa County Jail**

219.     On May 9, 2022, Defendants transferred Ms. Munday to general population where she predictably began selling and dispersing huge numbers of deadly fentanyl pills provided to her by Vasquez.

220.     On May 20, 2022, Defendants transferred Ms. Vasquez to general population

where she continued dispersing deadly fentanyl pills.

221.    From May 9-21, 2022, numerous instances visibly occurred, including on video, of incarcerated women suspiciously passing pieces of paper containing crushed fentanyl under doors and communicating with inmates through secured doors.

222.    Throughout this period of time, Munday dispersed fentanyl for money, and numerous incarcerated women placed recorded phone calls to associates asking them to place money on Munday's inmate account. Defendants knew this behavior confirms contraband sales. Incarcerated persons trading contraband within the jail often call outside associates to pay for it by placing money on the seller's books. Despite this knowledge and the recorded calls, the County failed to act.

223.    Munday distributed pills provided to her by Vasquez to a number of other women, including Karli Locke. Jail pod video captured Munday handing contraband items to Locke on or about May 9, and likely on other dates after the women were housed together in general population. Locke further distributed the fentanyl to other women in the jail, including Ms. Lopez.

224.    On May 20, Defendant Courtney Cross observed Locke attempting to communicate with women in an adjacent pod, where Ms. Lopez was housed. This raised suspicion. Defendant Cross observed Locke pass an item under a security door to Ms. Lopez. Defendant Courtney Cross observed this suspicious conduct, which she knew meant women in one pod were distributing a contraband to an adjacent pod under the door, but failed to take action, despite the staff's knowledge by that point that fentanyl was being distributed throughout the women's pod.

225.     Defendant Cross, and all County Defendants, knew pills crushed in paper is a common way they are distributed through the jail, and that was what was likely being passed to Ms. Lopez—particularly given the reports of fentanyl in the jail.

226.     The unaddressed suspicious activity caught on surveillance while Ms. Vasquez was in booking as well as the drug distribution caught on camera in the yard and throughout Aspen Pod indicate a constitutionally defective policies and practices.

227.     County Defendants either saw suspicious behaviors indicating drug distribution and failed to act, or alternatively failed to monitor video surveillance in deliberate indifference to drug distribution they knew would occur it not interrupted.

**County Defendants Failed To Protect Ms. Lopez When They Knew Fentanyl Overdose Death(s) Were Imminent**

228.     On May 20, 2022, JBBS Counselor, Shannon Lovern, a NaphCare employee involved in providing care for women with OUD and other conditions, was informed by an incarcerated woman that pills believed to be laced with fentanyl were being passed around and offered to people in a women's unit of the jail.

229.     The reporting woman stated to Lovern someone "**someone was going to end up dead**" unless the jail acted quickly. Defendant Lovern knew the woman from JBBS to be "drug savvy" and therefore credible in reporting the information. The reporting woman stated someone had even offered her a pill, which she'd handed back, and that at least 20-30 pills were at that moment circulating in pod.

230.     The reporting woman was so worried about someone dying from an overdose that she specifically asked Defendant Lovern to ensure the information was reported to security staff

51

and acted on to prevent someone from unnecessarily dying.

231.    Defendant Lovern knew this information was extremely alarming and that if appropriate action was not immediately taken, a patient suffering OUD like Ms. Lopez may be presented with fentanyl-laced pills and, due to their disease, take the pill, overdose, and die.

232.    Defendant Lovern knew the situation was life or death based on her training and experience, based on common knowledge that a single fentanyl pill can kill, and based on the reporting woman's specific statement someone was going to "end up dead" unless the jail acted urgently.

233.    Defendant Lovern failed to take action she knew was necessary to save lives. Although Lovern reported some of what she learned to a deputy, she intentionally withheld information, particularly the reporting woman's name.

234.    On May 20, Defendant Lovern informed Defendant Bowen, the Sergeant overseeing this area of the jail, the information alleged above that she learned from the reporting woman, that deadly fentanyl pills were circulating in a women's pod.

235.    The County Defendants who learned this information from Lovern, including Bowen, who also failed to request the name of the reporting woman, or insist it be provided.by Lovern.

236.    With that information, and given his training and experience, and his supervisory role, Defendant Bowen knew that someone could overdose and die at any moment due to the spread of deadly fentanyl in the jail. Shockingly, in deliberate indifference to this known and obvious risk, Defendant Bowan failed to take immediate action to protect people like Ms. Lopez.

237.    The name of the reporting person was not confidential, nor was the information

she provided to Defendant Lovern. To the contrary, as a JBBS in the jail Defendant Lovern had a duty to protect people including Ms. Lopez, which she failed to satisfy in deliberate indifference to the obvious risk of overdose and death to women in the jail, including Ms. Lopez.

238.     Defendant Bown should have immediately investigated the information, including obtaining the name of the reporting woman, obtaining the names of women seen passing drugs, interviewing and isolating these individuals, reviewing security footage, calling in K-9 fentanyl search dogs, locking down the area and stopping inmate movement, ensuring constant monitoring of all detainees, and other action he knew was necessary to promptly investigate the information and prevent unnecessary death.

239.     Rather than sound the alarm, Defendant Bowen punted the issue to tomorrow, May 21, in deliberate indifference to the life-threatening dangers.

240.     Defendant Bowen ordered a "shakedown" or search of the units for afternoon on May 21, approximately 24 hours later. Not only was this measure inadequate, it meant an inexcusable delay to afternoon the next day allowing plenty of time for an overdose death in the meantime.

241.     Defendant Bowen discussed the presence of fentanyl in the women's pods on May 20 with a number of other Defendants also responsible for safety in the jail, including Defendants Huckins, Roberts, Sandoval, and Cross. These Defendants had their own duties to intervene and/or notify supervisors, up to and including the Sheriff if necessary, of the danger in the jail and the need for immediate action. Instead, no one acted on May 20 or the morning of May 21 to protect Ms. Lopez or others in the jail from the fentanyl they knew was spreading.

**County Defendants Failure To Act On May 20 In Deliberate Indifference**

242.     Pursuant to MCSO policy, Defendant Bowen was required to notify the Lieutenant Lisa Peck, and Detention Captain Art Smith, his superiors, of the drugs believed to be fentanyl spreading in the women's unit in the jail. Due to this serious criminal activity, as well as the grave security and safety risks, policy required Bowen to notify these individuals as well as the Master Control (who would disseminate the information). Because the fentanyl spread impacted other units of the jail, the information would also have been communicated to and known by Defendant Sergeant Tate.

243.     On information and belief, Defendants Smith, Peck, and Tate, were notified of the reported fentanyl spread in the women's unit, on May 20. Defendant Bowen was not disciplined for violating any MCSO policy in this case, therefore it is alleged he informed Defendants of this important information as policy required him to do.

244.     Defendants knew the lethal risk from fentanyl pills circulating in the jail population, yet failed to take action they knew to be necessary, including the measures alleged herein.

245.     County Defendants knew, as any layperson knows, that opiates and fentanyl especially causes tens of thousands of opiate overdose deaths yearly, including in jails. This was common knowledge and also evident from the existence of opioid treatment programs introduced into the facility including MAT treatment. Common sense indicates that a large, vulnerable population of people with Opioid Use Disorder, and lethal fentanyl circulating in the jail, created a substantial risk of relapse, overdose, and death.

**County Defendants Failure to Protect and Monitor Ms. Lopez's Unit on May 20-21 When They Knew Fentanyl Was In Her Unit**

246.    On May 20, Defendant Whitney Huckins was informed by Defendant Bowen about fentanyl in the women's pods. The morning of May 21 around 8-9am, an incarcerated women then also notified Defendant Huckins through an intercom that drugs were being passed around the jail in the unit housing Alizon Lopez. She failed to act on this information, in deliberate indifference to the dangers.

247.    Defendant Huckins also failed to adequately monitor Ms. Lopez's unit for safety by failing to conduct adequate security checks of the pod, including Ms. Lopez's cell, despite knowing fentanyl was being passed around the jail since the evening before.

248.    Defendant Huckins was responsible for security checks for Ms. Lopez's pod on May 21. Written policies required that Huckins require safety checks of Aspen Pod 2 at 30-minute intervals. The written policy requires that these safety checks involve putting "eyes on" all inmates. Defendant Huckins knew that ensuring an incarcerated person is safe in a cell requires confirming they are breathing and not suffering from a medical emergency.

249.    Defendant Huckins failed to put eyes on Ms. Lopez during 30 minute checks that day, failing to ensure Ms. Lopez was breathing and not suffering from any medical emergency.

250.    Defendant Huckins returned from a safety check at around 2:25pm. Almost immediately after, Abbie Bennett, Ms. Lopez's cellmate, came running from their cell to alert deputies that Ms. Lopez was unresponsive. Defendant Huckins found Ms. Lopez on her bunk, with her legs in a butterfly position, and her torso slumped over to the point of her forehead resting against the bed. Ms. Lopez's face was blue and her hands were curled in. By Deputy Huckins' own admission, Ms. Lopez's visibly unnatural body positioning raised alarms and indicated trauma and distress necessitating urgent attention.

251.     This demonstrates Defendant Hucksins' 30-minute checks either were not performed at all, or that she performed the checks in a cursory and unsafe manner, failing to even look at Ms. Lopez. If she had, she would've observed Ms. Lopez's body in distress at an earlier time, possibly hours earlier, and been able to administer Narcan to reverse the overdose and save Ms. Lopez's life.

252.     While the need to conduct careful safety checks exists 100% of the time in jail, that need was even more keenly present given Defendant Huckins knew potentially deadly fentanyl was circulating in the unit under her watch.

253.     Defendant Huckins's failure to conduct adequate safety checks, in deliberate indifference to the risks, therefore resulting in her failing to prevent and causing Ms. Lopez's death by fentanyl overdose under her watch.

254.     The knowledge of fentanyl in the pod, as well as the knowledge by deputies that Ms. Lopez suffered from Opioid Use Disorder, should have counseled for extreme caution and diligence in safety check between May 20-21. Had deputies complied with written protocol and put eyes on Ms. Lopez every 30 minutes, they may have found Ms. Lopez when she was still able to be saved. However, in deliberate indifference to the known risk of overdose to Ms. Lopez, Deputy Huckins failed to comply with this written policy in what was the accepted standard practice and procedure within the jail.

255.     MCSO written policy requires staff including Defendant Huckins to ensure direct visual observation of detainees like Ms. Lopez every 30 minutes, and that such checks should be "sufficient to determine whether the inmate is experiencing any stress or trauma."

256.     The actions and inaction of the MCDF jail personnel, their deliberate indifference and reckless disregard for Ms. Lopez's safety, was consistent with the County's actual standard procedure, practices, and training, which violated the jail's supposed written policy. Although requiring thorough safety checks on paper, in practice, as is evident in this case, the facility had an unofficial but accepted standard practice of deputies ignoring issues that raised cause for concern, and of not requiring staff to report anything that caused concern, and of not requiring staff to check for actual signs of life (i.e., breathing) and well-being—this is evident in the failure of safety checks as well as the numerous causes for concern caught on security footage but either unobserved or unreported.

**Mesa County's Policies, Procedures, Practices, Customs, and Supervision Was a Moving Force Causing Ms. Lopez's Death**

257.     First, Mesa County implemented a policy of failing to separate and isolate individuals known or suspected to be hiding fentanyl or other dangerous contraband within their body, and instead allowing such persons to interact with others in the booking and admission process, enabling the flow of contraband into the general population of the jail. Mesa failed to do so deliberate indifference to the known and obvious dangers to life and safety.

258.     Second, Mesa County implemented a policy of failing to ensure individuals suspected or known to be hiding contraband like fentanyl, are adequately searched, isolated, and monitored until the fentanyl or other contraband is seized. Such measure were known to include isolation and monitoring (i.e. for consumed items of fentanyl to pass through the body), cavity searches, follow-up body scans, use of K-9 dogs to identify and locate fentanyl, and other

measures, in deliberate indifference to the risks fentanyl will enter general population and cause overdose.

259.    Third, Mesa County implemented a policy of failing to ensure patients suffering from OUD would receive adequate access to MAT or other necessary medication treatment, whether through its own duties and responsibilities or through NaphCare or another contractor, in deliberate indifference to the known risks.

260.    Fourth, Mesa County implemented a policy of failing to utilize immediate lockdown and monitoring when staff know deadly contraband like fentanyl is spread within the facility, despite knowing a temporary lockdown to isolate, investigate, and seize the contraband would save lives.

261.    Mesa County implemented other constitutionally-infirm policies which were a moving force in Ms. Lopez's death as alleged herein.

**Defendants' Action and Inaction Caused Ms. Lopez To Die From Fatal Overdose**

262.    Due to the actions and inaction of the County Defendants and deliberate indifference as alleged herein, on May 21, 2022, Ms. Lopez died from fentanyl overdose.

**NCCHC Guidelines Defendants Claimed To Follow—But Didn't—Required MAT**

263.    As alleged herein, Defendants knew MAT maintenance (not a 5-day taper) was the standard of care and medically necessary for years prior to 2022, but failed to provide it in deliberate indifference to the risks. But their deliberate indifference is further shown due to guidance published by NCCHC in March of 2021 regarding Opioid Use Disorder Treatment in Correctional Settings. In that NCCHC guidance, it was specifically explained that "in order to save lives" jails must implement MAT including by screening people upon entry to the jail,

offering MAT, and ensuring continuity of care for MAT.

264.    The NCCHC stated that OUD patients who have received MAT should be continued on medication in jails, and those who are not should be offered MAT and educated regarding its benefits.

265.    The NCCHC specified that jails and health care entities must train correctional health care and custody staff in the science and treatment of OUD, including that it is a chronic illness that requires patient education as well as MAT medication.

266.    The NCCHC emphasized the importance of providing MAT including continuous care to OUD patients like Ms. Lopez, because the opioid overdose death epidemic had by then reached an "all time high" of over 83,000 yearly, including within jails and prisons, and due to the high prevalence of OUD among people in jails. NCCHC stated "By providing access to MOUD and behavioral treatment based on national standards, prisons, jails, and detention facilities can reduce deaths, improve long-term health outcomes, interrupt the cycle of recidivism . . . and minimize litigation." It stated MAT was proven to improve medical and health outcomes and reduce relapses.

267.    NCCHC also stated that MAT alone is effective for the treatment of OUD, meaning medication even without therapy is effective.

268.    NCCHC sated that screening for OUD and education on treatment options by trained professionals helps identify those would benefit from medication treatment.

269.    NCCHC stated there is a "robust body of evidence" that providing MAT in jail is feasible and beneficial, and that there is a "striking mortality benefit" to providing MAT in jails, meaning providing MAT will save lives by preventing overdoses.

270.    NaphCare and County Defendants failed to meet this 2021 guidance, which was also know to them based on standards of care that had existed for a decade or longer, regarding MAT maintenance for patients with OUD like Ms. Lopez.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983—Fourteenth/Eighth Amendment—*Monell* Liability
### (Against Sheriff Rowell, Board of County Commissioners of Mesa County, and NaphCare)

271.    Plaintiffs incorporate all other paragraphs of this Complaint as if fully stated herein.

272.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

273.    Mrs. Lopez was a person within the United States and Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

274.    The Mesa County Defendants, at all times relevant, were acting under color of state law in their actions and inaction.

275.    At all times relevant, Ms. Lopez was an incarcerated person in pretrial detention and had clearly established rights under the Fourteenth Amendment to medical care and well-being, and to be free from deliberate indifference and reckless disregard for her life and safety as well as from cruel and unusual punishment. She also had clearly established due process rights under the Fourteenth Amendment to be protected and kept safe while incarcerated.

276.     NaphCare (and its parent and affiliated entities) is a private corporation that subcontracted with Mesa County to provide medical services to incarcerated individuals at the jail, including prescribing medications and MAT.

277.     The Mesa County Defendants are subject to non-delegable liability for the constitutional violations arising from the policies, procedures, customs, practices, and training of NaphCare and any parent and affiliated entities, and their employees.

278.     As a result of the allegations contained in this Complaint, NaphCare and the Mesa County Defendants are liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies, customs, procedures, decision-making, and training that resulted in the violation of Ms. Lopez's Fourteenth Amendment due process rights, including her right to be protected and kept safe, and Eighth Amendment rights, including the right to medical care, safety, and well-being while in custody and not be subjected to cruel and unusual conditions of confinement.

279.     NaphCare and the Mesa County Defendants knew that these policies, customs, procedures, decision-making, and training, posed an excessive risk of serious harm to incarcerated individuals like Ms. Lopez, and it was obvious that such serious harm would occur. Nevertheless, Defendants failed to take reasonable steps to alleviate those substantial risks. There is an affirmative causal link between the deliberate indifference of the NaphCare employees and jail staff towards Ms. Lopez's protected rights and NaphCare's and the Mesa County Defendant's policies, procedures, customs, decision-making, and training described herein, which were also the moving force behind the unconstitutional conduct and the moving force resulting in Plaintiffs' injuries and damages, including Ms. Lopez's death.

280.     NaphCare and the Mesa County Defendants are liable under 42 U.S.C. § 1983 for the deliberate indifference and constitutional violations of individuals including without limitation the Individual Defendants named in this lawsuit, as well as other non-named staff, County employees and agents, NaphCare employees and other medical staff.

281.     NaphCare and the Mesa County Defendants are liable under 42 U.S.C. § 1983 for the systemic violation of Ms. Lopez's constitutional rights, in the alternative to and even if no individual defendant committed a constitutional violation (although Plaintiffs allege they did), because their failed policies, procedures, customs, practices, and training were a moving force in and in deliberate indifference to the substantial risk of death to Ms. Lopez.

282.     In light of the duties assigned to their workers including the named Individual Defendants, the need for more or different training and supervision of them by NaphCare and the Mesa County Defendants was so obvious and so likely to result in constitutional violations if unmet, that the failure to do so was deliberately indifferent to the rights of Plaintiffs and the relevant public, and was a moving force in the injuries and death of Ms. Lopez.

283.     The unconstitutional acts and omissions of NaphCare and the Mesa County Defendants were the moving force in the unconstitutional acts of individual jail staff and employees, and the moving force resulting in the injuries and damages suffered by Plaintiffs.

284.     The Mesa County Defendants are liable for the non-delegable duties to provide constitutionally-adequate medical, mental health, and substance abuse care, and to adequately hire, train, supervise, and monitor its employees and contractors, including NaphCare and its staff, and any other contractors or subcontactors providing such services.

285.     As a direct and proximate result of these Defendants' unlawful conduct, Plaintiffs
have suffered injuries and losses entitling them to recover compensatory and special damages,
including for physical pain and suffering before and during death, loss of constitutional rights,
loss of life, all in amounts to be proven at trial.

286.     Plaintiffs are entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988,
including prejudgment interests and costs as allowable by federal law.

**SECOND CLAIM FOR RELIEF**
**C.R.S. § 13-21-131**
**Deprivation of Rights Under the Colorado Constitution**
**(Against all Individual County Defendants)**

287.     Plaintiffs incorporate all other paragraphs of this Complaint by reference as if
fully set forth herein.

288.     Qualified immunity is not a defense to this claim.

289.     Individual County Defendants acted under color of state law and within the course
and scope of their employment as law enforcement officers at all times relevant to the allegations
in this Complaint.

290.     At all relevant times, Individual County Defendants were "peace officers" under
Colo. Rev. Stat. § 24-31-901(3) and were employed by a local government.

291.     Ms. Lopez had a protected interest under Article II, § 25 of the Colorado
Constitution, in being free from the deprivation of life, liberty, or property without due process
of law.

292.     Ms. Lopez had a protected interest in the enjoyment of her life and liberty, and of
seeking and obtaining safety and happiness, as a natural, essential, and inalienable right, under

Article II, § 3 of the Colorado Constitution.

293.   Ms. Lopez had a protected interest to be free from cruel and unusual punishments, including death in jail, under Article II, § 20, of the Colorado Constitution.

294.   Individual County Defendants had a duty as sworn law enforcement to ensure Ms. Lopez's rights were protected, and to protect against and avoid harm to Ms. Lopez because they reasonably did or should have foreseen that their actions, and failure to act, would involve an unreasonable risk of harm to Ms. Lopez.

295.   Individual County Defendants subjected or caused Ms. Lopez to be subjected to the deprivation of individual rights secured by Article II, the bill of rights of the Colorado Constitution.

296.   Individual County Defendants did not act upon a good faith and reasonable belief that their acts and omissions regarding Ms. Lopez were lawful.

297.   Individual County Defendants actions and inaction was negligent, reckless, objectively unreasonable, and also in deliberate indifference to the known and obvious risks to life and safety of persons in the jail, including Ms. Lopez.

298.   The acts or omissions of the Defendants were the moving force behind, and the proximate cause of, the death of Ms. Lopez and the injuries sustained by Plaintiffs.

299.   The Individual County Defendants' acts and omissions described herein were done intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Ms. Lopez's constitutionally protected rights.

300.   Plaintiffs file this claim for relief pursuant to C.R.S. § 13-17-201(2), and allege that the claim is a good faith, non-frivolous claim filed for the express purpose of extending,

limiting, modify, or reversing existing precedent, law, or regulation, and for the express purpose

of establishing the meaning, lawfulness, or constitutionality of a law, regulation, or state

constitutional right, and the meaning, lawfulness, or constitutionality has not been determined by

the Colorado Supreme Court. Plaintiffs further allege that the issue to be decided may be a

matter of first impression. Plaintiffs have identified the state constitutional provisions identified

herein, and all laws and regulations referenced in this Complaint, as well as the case of *Leake v.*

*Cain*, 720 P.2d 152, 160 (Colo. 1986) (concluding public official's duty of care for causing harm

is determined in the same manner as that of a private party), for purposes of modifying or

extending law as required by this statute.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983—Fourteenth/Eighth Amendments
### (Against all Individual County Defendants and NaphCare Defendants)

301.     Plaintiffs incorporate all other paragraphs of this Complaint as if fully set forth

herein.

302.     Ms. Lopez was entitled to constitutional protections, and Individual County

Defendants and NaphCare Defendants to this claim are persons, for purposes of 42 U.S.C. §

1983.

303.     At all times relevant, Ms. Lopez was an incarcerated person in pretrial detention

and had clearly established rights under the Fourteenth Amendment to medical care and well-

being, and to be free from deliberate indifference and reckless disregard for her health, safety,

and life, and to be free from cruel and unusual punishment under the Eighth Amendment.

304.     At all times relevant, Individual County Defendants and NaphCare Defendants

knew of these clearly established constitutional rights of Ms. Lopez as an pretrial detainee, and

knew that their conduct violated clearly established law, and are not entitled to qualified immunity.

305.    Defendants' actions and inaction deprived Ms. Lopez of her Constitutional rights, and Individual County Defendants and NaphCare Defendants were deliberately indifferent to known and excessive risks of serious harm and death to Ms. Lopez.

306.    Individual County Defendants and NaphCare Defendants were acting under color of state law at all times relevant to this action.

307.    Each Individual County Defendants and NaphCare Defendants is individually liable to Plaintiffs for violation of 42 U.S.C. § 1983.

308.    Each of the Individual County Defendants and NaphCare Defendants subjectively knew about and was deliberately indifferent to the dangers posed, which they intentionally and deliberately disregarded; and, they knew of these excessive risks because they were obvious to them.

309.    Individual County Defendants and NaphCare Defendants knowing conduct constituted deliberate indifference and willful and wanton disregard to the excessive, substantial risks of serious harm and death to Ms. Lopez, depriving Ms. Lopez of life's necessities and life itself, failing to provide Ms. Lopez safe or humane conditions of confinement, failing to protect Ms. Lopez's health, safety, and well-being, and failing to provide necessary medical and mental health care, in violation of Ms. Lopez's Fourteenth Amendment due process rights, including the right not to be deprived of her life.

310.    The acts or omissions of Individual County Defendants and NaphCare Defendants were the legal and proximate cause and the moving force behind Plaintiffs injury and damages,

and Ms. Lopez's endured pain, suffering and death as a result of Defendants' deliberate indifference.

311.     All of the deliberately indifferent acts of each individual Defendant were conducted within the scope of their official duties and employment.

312.     Plaintiffs are entitled to and will seek punitive damages against these Defendants in that their actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Ms. Lopez.

313.     Plaintiffs are entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, prejudgment interest and costs as allowable by federal law.

**FOURTH CLAIM FOR RELIEF**
**Wrongful Death**
**(Against NaphCare Defendants)**

314.     Plaintiffs incorporates by reference the foregoing paragraphs of this complaint as if set forth fully herein.

315.     NaphCare is a private corporation that contracted with Mesa County to provide services including medical, mental health, and substance abuse treatment for incarcerated individuals in the jail.

316.     Individual NaphCare Defendants were at all times relevant employed by NaphCare as medical professionals whose duties included being responsible for medical care, MAT, mental health care, monitoring the medical condition of incarcerated individuals, and other medical and mental health services.

317.   Defendant NaphCare is vicariously liable for the negligent acts and omissions by their agents and/or employees, including but not limited to Individual NaphCare Defendants and other medical or other workers and agents, whether or not they are named defendants.

318.   Defendants NaphCare and the Individual NaphCare Defendants are private persons and entities for purposes of this claim, not public employees, and therefore are not entitled to immunity under the CGIA.

319.   Individual NaphCare Defendants had duties of care to Ms. Lopez, including to appropriately treat her OUD with MAT maintenance, evaluate and monitor Ms. Lopez, to screen her for medical and mental health needs, to raise medical concerns with superiors and other appropriate staff, and other medical and mental health care duties to ensure incarcerated individuals received adequate care.

320.   Defendant NaphCare had a duty to implement reasonable policies, customs, procedures, training, supervision, and decision-making, and to exercise reasonable care, regarding their employees working in the prison, including Individual NaphCare Defendants and other staff.

321.   These duties of care are informed by state law, which under C.R.S. § 16-3-403 mandates that "persons arrested or in custody shall be treated humanely and provided with adequate food, shelter, and if required, medical treatment." Humane treatment requires safety and protection from serious harm and death, including by fentanyl overdose. Adequate medical treatment requires both medical and mental health care, including MAT maintenance and other treatment for OUD, and further requires providers to serve a gatekeeping role and to hospitalize

or seek emergency care in appropriate circumstances. Defendants failed to meet these and other duties of care.

322.    Individual NaphCare Defendants breached their duties of care when they knowingly, recklessly, and negligently failed to appropriately treat or seek care for Ms. Lopez, including MAT maintenance, placing her at risk for death or serious harm.

323.    Defendant NaphCare breached its duties as articulated herein, and is vicariously liable for the reckless and negligent acts and omissions by their agents and/or employees, and other individuals not named herein. Defendant NaphCare is also directly liable for its own reckless and negligent failures in training, policies, practices, and supervision.

324.    Defendant NaphCare knew or should have known that the lack of supervision, training, and experience among their employees and agents was likely to harm individuals in their care and affected by their decisions, including Ms. Lopez.

325.    In failing to exercise reasonable care to meet the duties described herein, Defendants NaphCare and Individual NaphCare Defendants recklessly and negligently caused Plaintiff's injuries and damages including Ms. Lopez's death. The reckless and negligent acts and omissions by these Defendants also were a substantial and significant contributing proximate cause of the death of Ms. Lopez's death and Plaintiffs' damages.

326.    As a direct and proximate result of these Defendants' unlawful acts and omissions, Plaintiff suffered damages, losses, and injuries in an amount to be determined by a jury at trial. These damages include, *inter alia*, pain and suffering, upset, grief, loss of society and companionship, anger, depression, and all other damages as allowed under the Colorado Wrongful Death Act.

327.    As a result of Defendants' acts and omissions as described herein, Plaintiff suffered particularly grievous pain, suffering, and other damages as described above.

328.    Plaintiff has suffered and continues to suffer economic and non-economic damages due to Defendants' reckless and negligent conduct toward Ms. Lopez, including financial losses, non-economic damages for grief and suffering, loss of companionship, impairment in the quality of life, inconvenience, pain and suffering, and extreme emotional distress. Plaintiff is therefore entitled to general and compensatory damages and to special damages.

329.    Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the death of another.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 12133 - Title II of the Americans with Disabilities Act**
**(Against Defendants Sheriff Rowell and Board of Commissioners for Mesa County)**

330.    Plaintiff incorporates by reference the foregoing paragraphs of this complaint as if set forth fully herein.

331.    Plaintiff brings this claim against Defendants Rowell and the Board of County Commissioners of Mesa County.

332.    Drug addiction is a "disability" under the ADA.  See 42 U.S.C. §§ 12102 and 12131(2); 28 C.F.R. § 35.108 (the phrase "physical or mental impairment includes, but is not limited to . . . drug addiction, and alcoholism.").

333.    The ADA applies to people like Ms. Lopez, who suffered from Opioid Use Disorder and required participation in a supervised drug rehabilitation program. Ms. Lopez's diagnosis interfered with Ms. Lopez's basic life activities.

334.    Under Title II of the ADA, each state and local government and each agency of such a government is obligated to evaluate its current services, policies, and practices, and their effects, that do not or may not meet the requirements of Title II of the ADA, and if modification of services, policies, and practices is needed to achieve compliance, make the necessary modifications.

335.    Defendants denied Ms. Lopez the benefits of MCDF's medical programs on the basis of her disability.

336.    Defendants refused to make reasonable accommodation for Ms. Lopez by providing her with access to the medications she required to treat her Opioid Use Disorder—namely ongoing MAT, Methadone or Buprenorphine treatment. As such, Defendants excluded Ms. Lopez from receiving the benefit of the jails' medical services and observation. On information and belief, Defendants do not deny medically necessary, physician-prescribed medications to other inmates with serious, chronic medical conditions, such as diabetes.

337.    Additionally, Mesa County did not provide adequate training for its staff on how to properly secure MCDF in order to prevent introduction of contraband and, in turn, adequately accommodate and protect people suffering with Opioid Use Disorder.

338.    The failure of Mesa County to properly training MCDF staff on how to secure the facility in a manner that accommodated Ms. Lopez's disability violated Title II of the ADA.

339.    At all times relevant to this Complaint, Mesa County employed Defendants as staff or contracted with NaphCare medical staff and is vicariously liable for their actions under Title II of the ADA.

340.    Defendants' violation of Title II of the ADA proximately caused Ms. Lopez's injuries.

341.    Defendant's violations of Title II of the ADA caused Ms. Lopez to endure severe emotional and physical pain during her period of incarceration and, ultimately, death.

### SIXTH CLAIM FOR RELIEF
### 29 U.S.C. § 794 - Section 504 of the 1973 Rehabilitation Act
### (Against Defendants Sheriff Rowell, and Board of Commissioners for the County of Mesa)

342.    Plaintiff incorporates by reference the foregoing paragraphs of this complaint as if set forth fully herein.

343.    Plaintiff brings this claim against Defendants Rowell in his official capacity and the Board of County Commissioners of Mesa County.

344.    On information and belief, at all times relevant to this Complaint, Mesa County received federal funding for MCSO including for the operation of its jail.

345.    Under Section 504 of the 1973 Rehabilitation Act, "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

346.    Ms. Lopez was an individual with a disability. She suffered from Opioid Use Disorder and required participation in a supervised drug rehabilitation program. Ms. Lopez's diagnosis interfered with Ms. Lopez's basic life activities. These Defendants regarded her as having a disability.

347.    Defendants denied Ms. Lopez the benefits of MCDF's medical programs on the basis of her disability.

348.     Defendants refused to make reasonable accommodation for Ms. Lopez by providing her with access to the medications she required to treat her Opioid Use Disorder—namely ongoing MAT, Methadone or Buprenorphine treatment. As such, Defendants excluded Ms. Lopez from receiving the benefit of the jails' medical services and observation. On information and belief, Defendants do not deny medically necessary, physician-prescribed medications to other inmates with serious, chronic medical conditions, such as diabetes.

349.     Additionally, Mesa County did not provide adequate training for its staff on how to properly secure MCDF in order to prevent introduction of contraband and, in turn, adequately accommodate and protect people suffering with Opioid Use Disorder.

350.     The failure of Mesa County to properly training MCDF staff on how to secure the facility in a manner that accommodated Ms. Lopez's disability violated Section 504 of the 1973 Rehabilitation Act.

351.     At all times relevant to this Complaint, Mesa County employed Defendants as staff or contracted with NaphCare medical staff and is vicariously liable for their actions under Section 504 of the Rehabilitation Act.

352.     Defendants' violation of Section 504 of the Rehabilitation Act proximately caused Ms. Lopez's injuries.

353.     Defendant's violations of Section 504 of the Rehabilitation Act caused Ms. Lopez to endure severe emotional and physical pain during her period of incarceration and, ultimately, death.

### VII. PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor and against the Defendants, and award Plaintiffs all relief as allowed by law and equity, including, but not limited to the following:

a) Declaratory and injunctive relief, as appropriate;

b) Actual economic damages as established at trial;

c) Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of life and enjoyment of life, and other non-pecuniary losses;

d) Punitive damages on all claims as allowed by law in an amount to be determined at trial against all applicable Defendants;[1]

e) Issuance of an Order mandating appropriate equitable relief;

f) Pre-judgment and post-judgment interest at the highest lawful rate;

g) Attorney fees and costs; and

h) Such further relief as justice requires.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED: May 3, 2024

Respectfully submitted,

*s/ David G. Maxted*

---

[1] Plaintiffs also anticipate seeking punitive damages for the state law claims upon suitable amendment after completing substantial discovery.

David G. Maxted
Stephanie M. Frisinger
MAXTED LAW LLC
1543 Champa Street Suite 400
Denver, CO 80202
dave@maxtedlaw.com
stephanie@maxtedlaw.com
303-353-1535

*Attorneys for Plaintiffs*